[No. 27711.   Department One.   March 4, 1940.]

THE MOTTMAN MERCANTILE COMPANY, *Respondent*, v.
WESTERN UNION TELEGRAPH COMPANY, *Appellant*.[1]

*McMicken, Rupp & Schweppe* and *J. Gordon Gose*,
for appellant.

*Poe, Falknor, Emory & Howe* and *John N. Riese*,
for respondent.

ROBINSON, J.—This is an action for rent.

On March 29, 1929, George A. Mottman and wife
leased a ground floor room in the Mottman building,
a five-story structure in Seattle, to the Western Union
Telegraph Company, for a period of ten years, begin-
ning on April 1, 1929.   The lessee occupied the prem-

[1]Reported in 100 P. (2d) 16.

ises as a branch office for the receipt and delivery of telegrams. In March, 1934, the lessors transferred their interest to The Mottman Mercantile Company.

On the evening of January 19, 1938, a fire broke out on the fifth floor of the building. The fire was confined to that floor, but the water used in extinguishing it was not. In this connection, the answer alleges:

"That the Fire Department of the City of Seattle, in extinguishing said fire, poured large quantities of water on the premises above those occupied by the defendant, and that a very large amount of such water seeped into the premises occupied by the defendant and did such extensive damage thereto as to render said premises untenantable and unfit for occupancy of any kind for a period of at least ten days subsequent to January 19, 1938; that even after removal of such water from the premises occupied by the defendant it would have been necessary to make substantial repairs to said premises in order to render them tenantable or fit for occupancy."

The lease contained the following provision:

"In case the building on said premises, or that portion of such building leased by the party of the second part, shall be destroyed, or be so injured by the elements, or any other cause, as to be untenantable and unfit for occupancy, the party of the second part shall not be liable or bound to pay rent to said party of the first part for the same after such destruction or injury, and may thereupon, at its option, quit and surrender possession of the premises; but may if it so desire, upon the completion of the repair or restoration of said building reoccupy the same, or such portion as aforesaid, upon the terms and conditions herein set forth, the rental to commence from the date of such reoccupation."

Upon the theory that the premises had been rendered "untenantable and unfit for occupancy," the defendant began removing its records and appliances, and on January 24th, five days after the fire, it tendered

the rent then owing, informed the plaintiff that it elected to cancel the lease and surrender the premises. This action, however, was foreshadowed on the morning after the fire occurred. The defendant's manager testified that, on that morning, the plaintiff's rental agent told him that he would have the premises cleaned up at once, and that he replied that they could not be cleaned up, as water was still coming through. He further testified that he then and there decided to cancel the lease, and that he welcomed the opportunity because of the exorbitant rent his company was paying.

Plaintiff recovered a jury verdict. The defendant, as appellant here, urges that the trial court erred in not granting its motion for judgment notwithstanding, and in the matter of instructions given and refused.

An examination of the statement of facts reveals extraordinarily violent conflicts in the evidence. The defendant called six witnesses, all but one of whom were its own employees. At least three of these spoke of the water on the floor of the premises, after the fire, as being an inch deep in spots; the lowest estimate being one-half inch. They testified that the water came through the tin-covered ceiling in at least fifteen places, and used such descriptive expressions as: "It ran like water out of a faucet" and "came down in streams." And several said it continued to do so, though in lesser amounts, the next day, and even the fourth day thereafter; and one, that it was still dripping alongside the central light fixture on February 10th, almost three weeks after the fire. As to the side walls, one said that it came down in a steady stream fifteen feet wide. Two of them described it as still coming down in sheets the next afternoon.

At least an equal number of plaintiff's witnesses, one or two of whom appeared to be disinterested, observed

the premises at substantially the same times. Two of them described the floor as looking about like a wet sidewalk; one said, like a floor which somebody had scrubbed but forgot to mop dry. One even said the floor was dry. All of them denied seeing any water coming through the ceiling at any time. As to the walls, they conceded that they were somewhat stained and streaked, especially the north wall. Only one of them admitted seeing any water running down the walls, and this, he said, was a trickle about the width of a lead pencil. All of the witnesses agreed as to one thing, however, and that was that no plaster came off the walls.

Much was made of the fact that a restaurant on the same floor, though some twenty feet away, served breakfast as usual on the morning after the fire and never at any time discontinued business, although some water seeped down the side walls of the room.

There was testimony that the Western Union quarters could have been thoroughly dried out in thirty-six hours, that the walls could have been recalcimined in six, and that this work could have been done at night. At least two witnesses gave the opinion that the defendant could have continued business, although, for the first few days, with some discomfort. There was evidence that the plaintiff's architect, after examining the premises, advised that the only repairs necessary were to repaint the ceiling, calcimine the walls, and fix the lock on the door, and that these were the actual repairs ultimately made.

The major question presented on the appeal relates to instructions given and refused. The conflict between the instructions given and those requested is direct. The jury was instructed that the premises would not be rendered "untenantable and unfit for occupancy"

". . . if the condition of the said premises following said fire could be restored to a fit condition by ordinary repairs or services without unreasonable interruption of the business of the defendant, . . . "

The defendant's theory may be shown by the quotation of a sentence or two from its requested instructions:

"The words 'untenantable and unfit for occupancy,' as used in the lease, mean a condition of the premises which would render them unsatisfactory for the normal conduct of the defendant's business therein,"

or,

"If you find that the leased premises were rendered untenantable and unfit for occupancy, as alleged in plaintiff's complaint, but that the premises could have been restored to the state of tenantability and fitness for occupancy by the making of repairs, your verdict must nevertheless be in favor of the defendant."

That is to say, if the premises were rendered unsatisfactory for the normal conduct of the defendant's business therein, the right to cancel became *ipso facto* complete; and whether or not the premises could be restored to a fit condition without unreasonable interruption of the business, is wholly immaterial. It would seem, under this theory, that, if the glass front of a grocery was suddenly knocked out in subzero weather, the grocer could cancel his lease, even if the glass could be replaced within a few hours, for the theory rigidly excludes all questions as to the reasonableness of interruption and insists that the question—Were the premises rendered unsatisfactory for the normal conduct of the business?—is the sole test.

Appellant's contention is supported by an exhaustive and scholarly brief. Unfortunately, the argument must lose much of its force when condensed to the mere outline to which we must confine it. It is first pointed out

that, at common law, even if a leased building was completely destroyed by fire, the lessee, nevertheless, remained liable for the full amount of the rent. The practical working of this rule proved so harsh under modern conditions that, in some states, statutes were adopted relieving tenants from its consequences, and it long since became the practice to insert special provisions in leases to accomplish that result. These special provisions range from those relieving the tenant only in case of complete destruction to those where he is relieved where the premises are rendered "untenantable and unfit for occupancy," and provisions even more liberal are not unusual.

It is conceded that many courts have held that the words "untenantable and unfit for occupancy," as used in statutes and lease provisions, mean only a condition where the damage is so great that it cannot be repaired without an unreasonable interruption to the tenant's business. The following are cited as typical examples: *Barry v. Herring*, 153 Md. 457, 138 Atl. 266; *Basketeria Stores v. Shelton*, 199 N. C. 746, 155 S. E. 863; *Schulte, Inc. v. American Realty Corp.*, 256 Mass. 258, 152 N. E. 233; *Wolff v. Turner*, 6 Ga. App. 366, 65 S. E. 41; *Sherrill v. Kirklin-York Co.*, 202 S. W. (Tex. Civ. App.) 775; see, also, 2 Underhill on Landlord and Tenant, 1349, § 792.

It is contended that such decisions, although in line with the weight of authority, have been unduly influenced by the old common law concepts, and that they completely disregard the sound and universally acknowledged principle that men have the right to make their own contracts and, as corollary to that, the right to have the words they use in so doing interpreted in accordance with their usual and ordinary meaning. It is insisted that the words "untenantable and unfit for

occupancy," as used in present day leases, should be given their usual and ordinary meaning.

The appellant urges that the courts of some jurisdictions have long ago freed themselves from the influence of the old common law concept, and cites as examples the following cases: *New York Real Estate & Bldg. Imp. Co. v. Motley,* 143 N. Y. 156, 38 N. E. 103; *Tallman v. Murphy,* 120 N. Y. 345, 24 N. E. 716; *Roman v. Taylor,* 93 App. Div. 449, 87 N. Y. Supp. 653; *Trumbull v. Bombard,* 171 App. Div. 700, 157 N. Y. Supp. 794; *Daly v. Schenk,* 8 N. J. Misc. 697, 151 Atl. 637; *Acme Ground Rent Co. v. Werner,* 151 Wis. 417, 139 N. W. 314; *Denham v. Madole,* 194 Wis. 583, 217 N. W. 423. While the general discussion of the matter in appellant's brief is logical and forceful, we do not find these cases very persuasive. In none of them is there a general discussion of the question involved. About the only pertinent general statement is found in *Tallman v. Murphy,* where, with reference to the words "untenantable and unfit for occupancy," the majority opinion says: "The statute contemplates an injury to the building which substantially affects the enjoyment of it by the tenant." In several of the cases, the premises would have been held untenantable under either of the theories under discussion.

Furthermore, in each of the cases cited, the respective courts were construing the words under discussion as used in statutes; and they had, and realized that they had, a legislative sanction for making a liberal construction in favor of the tenant. It is said, in the second of the Wisconsin cases, citing and quoting a number of decisions from other jurisdictions to support the statement, that:

"The plaintiffs contend that the statute is to be strictly construed as it is in derogation of the common

law, but it clearly appears that the statute was intended to relieve tenants from the rigors of the common law, and we think it should be liberally construed to give it the legislative intent."

The appellant further contends that it is very apparent that the parties in this case, in arranging their lease, were not intent upon common law language, but intended to define their respective rights in their own way; and, in support of this, it is pointed out that, after providing for cancellation, if the premises became untenantable, they went on to include a long, involved, and unprecedented provision to the effect that, even though the premises should be rendered untenantable, the tenant should have the option to reoccupy the premises upon their restoration and repair. Hence, it is said that all of the words in the lease should be given their usual and ordinary meaning.

Finally, it is urged that the matter is of first impression in this jurisdiction, and, therefore, that no consideration of *stare decisis* forbids our discarding the allegedly outworn common law concept and holding that the words "untenantable and unfit for occupancy," as used in leases, mean simply a condition which renders the premises unsatisfactory for the normal conduct of the tenant's business; and that the length of the interruption is in no way involved. It is contended that this is not only the more logical rule, but that it is more susceptible to certain application than one which leaves a question of reasonableness to be decided by court or jury.

It is conceded that the phrase which we have had under discussion is used in many leases written in this state. If it be true that we have not hitherto interpreted it, then the draftsmen of such leases must have relied upon the meaning given to it by the majority of the decisions rendered in the courts of our sister states;

and that, as appellant admits, is contrary to the rule for which it contends and in accordance with the instruction given by the court. If we should adopt the rule contended for, serious consequences might follow. For example, leases which have ten, twenty, or thirty years to run and whose continuance involves the continuance of collateral arrangements involving the well-being of minor heirs, *cestui que trusts,* etc., might be canceled because the tenant's complete enjoyment of the premises was, by some wholly fortuitous event, interrupted for a single day.

Perhaps, this is an instance where flexibility is preferable to certainty. Let us suppose a case where a lease has but two months to run, and another where the unexpired term is twenty years, and that, in each instance, by some fortuitous event, the premises are rendered unsatisfactory for the normal conduct of the tenant's business for a period of two or three days. Under the rule for which appellant contends, the right to cancel would be absolute in both cases. Variations in length of unexpired terms, as well as variations in other circumstances, would seem to make a more flexible rule desirable. But if this is not so, there is nothing to prevent lessors and lessees who desire the rule contended for by appellant from discontinuing the use of the words "untenantable and unfit for occupancy," and providing that the tenant may cancel when, for any reason, the premises are rendered unsatisfactory for the conduct of his business therein. In any event, in our opinion, it is not for the court to radically alter, by judicial decision, a generally accepted rule of real estate law.

■ There is a further contention that instruction No. 5, even if correct in content, is objectionable in form, in that it is said to be argumentative and one-

sided. The instruction is, perhaps, somewhat open to this criticism, but we cannot believe that it had any prejudicial effect.

The judgment appealed from is affirmed.

BLAKE, C. J., MAIN, MILLARD, and SIMPSON, JJ., concur.