STANDARD INDUSTRIES, INC. *v.* ALEXANDER SMITH, INC.

ALEXANDER SMITH, INC. *v.* STANDARD INDUSTRIES, INC.

[No. 243, October Term, 1956.]

(Two Appeals In One Record)

216

*Decided June 27, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Melvin J. Sykes,* with whom was *Charles F. Obrecht* on the brief, for Standard Industries, Inc., appellant and cross-appellee.

*Lawrence B. Fenneman* and *Philip Heller Sachs,* for Alexander Smith, Inc., appellee and cross-appellant.

HAMMOND, J., delivered the opinion of the Court.

The suit below was a bill by a landlord, Standard Industries, Inc., seeking a declaration that a lease between it and Alexander Smith, Inc., tenant, was binding until the expiration of its stated term, June 30, 1956. In August, 1955, the property was flooded during the passage of Hurricane Connie and the tenant, claiming that resulting damage justified the action, cancelled the lease. The case was tried in open court and on the third day of the trial, the tenant asked and received leave to amend its answer to add a prayer for loss of rent sustained by it when its sub-tenant cancelled its lease. The chancellor dismissed the landlord's bill and denied the tenant's prayer for loss of rent. Each appealed.

Standard owns some ten acres in Southeast Baltimore, improved by a brick platform type single story building containing approximately 110,000 square feet. The property is lo-

cated in a low area bounded on the west by the North Point Road, on the north by the B. & O. railroad tracks on an embankment eighteen feet high, on the east by Herring Run, and on the south by a farm. A considerable portion of the building is built over a pit eight feet deep, two hundred twenty feet long and thirty-six feet wide, into which drains excess water coming onto the lot. This reservoir holds nine thousand gallons of water and when the water reaches a certain level, automatic pumps begin to work.

In 1946 Smith became interested in leasing the property and several of its officials came down to view it, including one Miller, manager of the region of which Baltimore was a part, and one Boal, who was in charge of all real estate operations, and two engineers. At that time the property was in the "middle of a marsh" and Standard was starting to build a dike between Herring Run and the property. In April, 1946, Standard and Smith executed a lease for a term of five years, beginning July 1, 1946, with the option in the tenant to renew for an additional term of five years, at an annual rental of $27,200. The premises demised consisted only of a portion of the building known as Building "A", comprising approximately 68,000 square feet. The lease provided that the tenant was to make all repairs necessary to maintain the demised premises, "excepting repairs of a structural nature" which were the obligation of the landlord. There was this further provision:

> "If, during the term of this Lease, or any renewal thereof, said demised premises shall be substantially destroyed by fire, the elements or any other cause not the fault of the Lessee, then this Lease, at the option of the Lessee and upon notice in writing to the Lessor, shall cease and terminate, and each Party shall be released from further obligation hereunder, and Lessor shall refund to Lessee any portion of the rent paid in advance and not earned at the time of such destruction.

> "If, however, during the term hereof, the said premises shall be only partly destroyed by fire, the

elements or any other cause not the fault of the Lessee, then the Lessor shall repair such premises as speedily as possible at Lessor's expense, and until the completion of such repairs Lessee shall be entitled to a reduction of rent in proportion to the amount of floor space of which they are deprived the use while such repairs are being made.

"Damage to such extent as to render fifty (50%) per centum or more of the floor space unusable for the purpose of Lessee's business shall be deemed a 'substantial destruction' within the meaning of this agreement, and damage which renders less than fifty (50%) per centum of the floor space unusable for the purpose of Lessee's business, but which cannot be repaired within ninety (90) days shall likewise be deemed to be a 'substantial destruction'. Damage which renders less than fifty (50%) per centum of the floor space unusable for the purpose of Lessee's business, and which can be repaired within ninety (90) days shall be deemed to be a 'Partial destruction' within the meaning of the agreement."

In the Fall of 1946, there was a heavy rain and Herring Run broke through the dike near the B. & O. railroad tracks and inundated the leased building to a depth of between one and two feet. Standard thereupon replaced the section of the dike in question with a different kind of earth and built it to a higher level. In 1947 the combination of roof leaks and outside water caused about four inches of water to come in the warehouse, damaging materials of Smith, which thereafter put its merchandise on skids or platforms above the floor level. Standard again raised the level of the dikes. Early in 1948, Smith took over the whole of the leased premises, (a portion had previously been sub-let) and sent its employees, Barrett and LeNaire, both qualified engineers, to "study the flood control situation around the warehouse". LeNaire filed with Smith a report and a plat, a copy being sent to Standard for its information. The report outlines the problems and discusses a plan, explained to LeNaire by

Standard's manager, for the control of flooding in the future. Included in the measures to be taken (and that were taken) were an extension in length and addition in height to the dikes, the digging of a new drainage ditch on the north side of the property, and the placing of a new pump, the capacity of which was to be increased if the one proposed proved to be inadequate. LeNaire's conclusion in the report was "that the proposed method seemed logical to me." In June, 1948, during a heavy rain, water entered the property again and inundated the motors of the heating system which had to be taken out and dried.

By a letter dated August 8, 1949, Smith, without even suggesting a change in the language of the lease, exercised its option to renew the lease for an additional five-year term ending June 30, 1956.

In September, 1950, the premises were flooded to a depth of four feet throughout. Water covered desks, files and office equipment, soaked the motors of the sewage pumps which Smith had installed, making it necessary to bake them out and rewind them, covered the walls and floor with mud, silt and dirt, and damaged Smith's inventory to the amount of over $250,000. When the flood receded, Smith took five days to evacuate much of its merchandise and then washed off the walls and scrubbed most of the floors and continued to use the building. Immediately after the flood of 1950, Standard increased the height of the dikes seven to nine feet above the normal level of Herring Run, and Smith built brick sills in the doorways and later raised the Herring Run dikes with earth fills supplied by Standard to a height of ten or eleven feet, even higher than Standard had raised it immediately after the storm. Standard extended its dike on the south side all the way to North Point Road. From this time until the date of Hurricane Connie, in August 1955, no water entered the building. Smith continued to occupy the leased premises until 1951, when it made plans to transfer its warehouse to a new building on Erdman Ave. There was testimony that the move was because Smith was not willing to risk further floods. Smith wrote to this effect to the National Production Authority of the U. S. Department of Commerce in 1951

in an effort to obtain construction priorities, saying: "We are presently located in a building in which we are continually vulnerable to flood damage and in order to operate successfully it is essential that we move. * * * If permission is not granted to erect the facilities that we now require * * * we will be placed in a position of unreasonable hardship * * * primarily due to the recurring flood damage which must be anticipated in view of our past experience and which condition is beyond our control to correct." About eight months after this letter, Smith's officer in charge of its real estate operations, who had visited the property and conferred with Standard's president after the flood of 1950, wrote to him as follows: "As I mentioned to you, we expect to transfer the showroom and warehouse operation to our new location on Erdman Avenue sometime in the spring, at which time part or all of the space we lease from you will not be needed by us. However, we intend to fulfill our obligations under our lease agreement which extends through June 30, 1956, but would appreciate your cooperation in any sub-leasing arrangement we might make."

In June, 1952, Smith sub-leased the property to Bendix Aviation Company for a two-year term ending August 31, 1954, at an annual rental of $44,200. Under the sub-lease, Smith was responsible to Bendix for plumbing and heating facilities, all pumps, electrical facilities, flood control dikes and repair of all interior portions of the demised premises. When the sub-lease expired on August 31, 1954, Bendix wanted as short a commitment as possible because "our continued use of the premises in terms of definiteness was indeterminate", and became a monthly tenant at the same rental and on the same conditions, except as to term. After the sub-lease and before Hurricane Connie, Smith vacated its new building in which it had moved in 1952 and abandoned all but a negligible part of the storage of its merchandise in the Baltimore area. Hurricane Connie commenced August 12, 1955, and brought with it approximately eight inches of rain within twenty-four hours, more rainfall than had ever been recorded in this area since the commencement of United States Weather Bureau records. In preparation, Standard

stationed six men on the property, which had been provided with pumping facilities with a total capacity of 220,000 gallons per hour. They succeeded in keeping the premises free of water until late Friday night, August 12, by which time more than five inches of rain had fallen. On August 13, Herring Run became so swollen that it could not get through the culvert at Pulaski Highway, which was about 500-700 feet north of the demised premises. It overflowed Pulaski Highway, ran down North Point Road, flooding all property adjacent to the east side of that road, entered the demised premises and, ironically, trapped by the protective dikes and the B. & O. embankment, the water reached a depth of eight feet both inside and outside the building. During the night a dike broke from the inside and water dropped about three feet.

Immediately after the hurricane, Bendix concluded that it would vacate the property and on August 15, notified Smith of the cancellation of its tenancy, claiming a refund of half of the August rent which had been paid. On August 19, without having any direct knowledge of the condition of the demised premises and without inquiry to or communication with Standard, Smith wrote Standard that it had been advised that the flood had rendered the premises "completely unusable" and that it, therefore, "in conformance with lease agreement" elected to declare the lease terminated "as of the date the premises became untenantable." Smith requested refund of the portion of the rent not earned "at the time the premises became untenantable", which it assumed to be August 15.

The dispute between the parties is not so much as to the effect of Hurricane Connie on the demised premises, but rather is as to the application of the language of the lease to what is more or less agreed to have occurred. It is undisputed that the storm caused no structural damage to the building, that is, to the walls or the superstructure or the floor. Appellant employed Baltimore Contractors, Inc., to repair the broken dike, wash down the exterior of the building, and pump out the lot and the building. Bendix had filled the building with racks, shelving and equipment for the material

it was storing. It put a force of one hundred fifty men in the building to salvage its property stored there. On August 17 and 18, Hurricane Diane struck but no water came into the building. On August 19, one week after the onset of Connie and one day after Diane had ended, Baltimore Contractors had completed its work and was out of the property. By August 20 or 21, Bendix's material had been moved out and the evacuation force, which had worked around the clock until that time, cut down to eight hours work a day devoted exclusively to removing the extensive shelving, racks, fixtures and equipment, and the debris and mess caused by the flooding. Bendix was completely moved out by August 25. After the water had been cleared, it was shown that the only effects of the hurricane on the demised premises were: (1) damage to the electrical system, including the motors to the heating system, not then in use, on which repairs were completed August 26 at a total cost of $500; (2) fifteen to twenty broken panes out of several thousand in the demised premises (most of these had been deliberately broken to accommodate pump hoses); (3) some doors off their hinges; (4) one section of office partitions, which had been installed by Smith, broken by Bendix employees in moving their equipment out of the office; (5) temporary inoperability of toilets and lavatories, which had been installed, maintained and pumped by Smith, during the time the electricity was off; (6) discoloration of celotex ceiling installed by Smith in what was described by counsel for Bendix as a "rather minor or small area" in the office, which apparently could be replaced for under twenty dollars; (7) damage to approximately fifteen square feet of asphalt flooring, which had been installed by Smith, and which Bendix workers tore up in the course of the evacuation; (8) dried out and caked mud and silt on the walls and floors; and (9) a small part of the access road, not part of the demised premises, was destroyed and required resurfacing at a total cost for the slag used, of $48.00. The bills which were offered in evidence showed that the total expenditures to outside contractors for all of the damage, including the repair of the dikes and the washing and pumping of the exterior and interior, was $4,600, and the pumping cost $3,600 of this.

Three of Standard's employees on its regular payroll also received a total of $500 for their work in this connection. Standard painted the inside and out to erase the water line, at a cost of $500 for the paint and $500 for labor. Standard's vice president testified that if he could have had access to the property immediately after the storm and had not been delayed by the efforts of Bendix to salvage its property, he could have eliminated all effects of the hurricane within two weeks of its onset, pointing out that in the section leased to Robb Tyler, which had been flooded exactly as had Smith's section, Tyler had cleaned up the premises as soon as the water was pumped out and was back in operation by August 23. The vice president testified that the property was in fact completely tenantable by September, and the chancellor found that it was completely tenantable within a month or less of the onset of the hurricane. The only conflict in the evidence as to when the effects of the hurricane were completely erased related to the matter of dirt and silt. Smith's employee, McComas, testified that on a number of visits in September, October and November, he found the floors muddy, that is, covered by dry and caked mud. His testimony was flatly contradicted by a completely disinterested witness, Hunt, who at one time had leased adjoining property. Hunt testified that on September 15 and 16 he visited the demised premises with a view to leasing it himself, and on that day, the floors were clean and in such condition he could, and did, lay out plans on them with chalk.

The chancellor found that: "Taking all the facts as a whole, the extent of the damage, its nature, the time required for restoration, under all the circumstances it is my opinion that there was such damage within the meaning of the lease as to render 50 per cent or more of the floor space of the demised premises unusable for the purposes of the lessee's business, and that therefore there was a substantial destruction within the meaning of the agreement and the lease was terminated." In reaching this conclusion, the chancellor apparently laid much, and we think, undue, stress on a letter from the vice president of Standard to the Bureau of Assessments of Baltimore City, written on August 23, 1955, in an

effort to obtain a reduction in the assessment. In the letter it was stated: "We feel that the flood that occurred has caused at least a seventy-five per cent damage to the buildings and have [has] made the entire property unsalable." There is no doubt that the letter attempted to create the impression that tremendous damage had been caused by the hurricane, but it is equally clear that its estimates and conclusions were at complete variance with the facts. The testimony, including the bills offered in evidence to show the character and extent of the damages and the work necessary to repair it, refute the claims made in the effort to obtain the reduction in the assessment.

At common law the destruction of leased premises by fire or other casualty usually did not terminate the lessee's obligation to pay rent. The effects of such a casualty are regulated now by Code, 1951, Art. 53, Sec. 37, except where, as in the case before us, the lease deals with the matter, in which event the lease controls. *Spear v. Baker,* 117 Md. 570. Obviously, the demised premises were not substantially destroyed in the ordinary meaning of these words. It is held with unanimity that for substantial destruction to occur within the meaning of a provision of a lease giving the right to terminate in such case, the destruction must be such as to render the premises permanently untenantable or such that restoration would be practically the equivalent of a new building, or so extensive that the demised building has, as a practical matter, lost its character as a building. *Barry v. Herring,* 153 Md. 457; *General Outdoor Advertising Co. v. Wilson,* 93 N. Y. S. 2d 131; *Clayton v. Perry* (Mass.), 176 N. E. 522. Smith relies on the clause in the lease which defines substantial destruction as including "Damage to such extent as to render fifty (50%) per centum or more of the floor space unusable for the purpose of Lessee's business", its contention being that since Connie had made the entire floor space unusable for the purpose of the sub-lessee's business, at least for a temporary period, there was a substantial destruction within the meaning of the lease. The chancellor did not accept this contention unreservedly, noting that: "* * * I do not think it would follow that even total unusability for an instant of time

would result in termination. * * * suppose that by reason of the elements in some way gas had escaped and filled the premises * * *. The premises would be untenantable and would continue to be untenantable until the gas was removed. * * * Certainly, in my opinion, it would not be the law that that kind of untenantability would be reason for the lease to terminate." We think the chancellor was right in this conclusion and that the language of the lease must have been intended to refer to untenantability of at least fifty per centum of the floor space of the premises in the sense that that term is usually considered or construed. It is to be remembered that the lease covered a one story building, so that unusability of the floor would result, foreseeably, only from physical damage to the building itself. When the language in question was adopted by the parties, the building had already been flooded on several occasions, and in the nature of things, if water entered the premises, it was hardly to be expected that it would affect only a portion of the floor area. It seems unlikely, in view of the location of the property and what had happened before, that the parties contemplated non-structural damage from flooding as within the ambit of the language used. This conclusion is reinforced by the construction that the parties themselves put upon the meaning of the lease. In 1950, when over four feet of water came into the building and rendered the premises untenantable for some days, the resulting effects were much the same as they were in 1955. On that occasion, Smith cleaned up the mess and the mud, added extra precautions against reoccurrence of flooding and, without protest, suffered a loss in excess of a quarter of a million dollars to its merchandise. . No claim was made at that time that what occurred gave Smith the right to cancel the lease, and after this experience, Smith, in writing, reaffirmed the obligations of the lease and its intention to be bound by them. The conduct of the parties to a written contract may amount to a construction of ambiguous provisions in it. *Saul v. McIntyre*, 190 Md. 31, 36; *Evergreen Amusement Corp. v. Milstead*, 206 Md. 610, 616, and cases cited, including *Eastern Woodworks, Inc. v. Vance*, 206 Md. 419. We think that the language of the casualty clause of the lease

permitted the tenant to terminate only if damage to the building itself rendered fifty per centum or more of the floor space unusable, that is, that structural damage to the building must have created untenantability which could not be cured by ordinary repairs which could be made without unreasonable interruption to the use of the premises by the tenant. That Smith regarded the words "unusable for the purpose of Lessee's business" as synonymous with "untenantability" is indicated by its letter of cancellation.

Giving the casualty clause the construction that we think it must be given, there is no real doubt that the effects of Hurricane Connie were not such as to justify cancellation of the lease. In *Barry v. Herring*, 153 Md. 457, *supra,* the leased building was considerably damaged by fire and the question was as to the effect on the rights of the parties under the provisions of the lease that "If the property shall be destroyed or rendered untenantable by fire, the tenancy hereby created shall be thereby terminated * * *." As a result of the fire, some of the joists supporting the first floor, as well as the floors, were burned, plaster on the ceiling and some of the side walls were damaged by fire and water used in extinguishing it. The furnace and heating pipes, the electric light wiring, were injured, and the property was otherwise damaged. There was testimony that repairs could be made for some $2,600 in a period of fifteen days, and the interruption to the tenant's business would be four days. There was also testimony that the cost and extent of the repairs and the interruption to the business would be greater. The Court said: "It is fairly well settled by the authorities that, where a lease contains a provision like the one before us in this case, made primarily for the benefit of the lessee, and the leased building is destroyed or rendered untenantable, the tenancy is thereby terminated, if to restore such building it becomes necessary to rebuild it, thereby depriving the tenant of its use. But where the building may be restored by ordinary repairs made thereon with no considerable interruption to the tenant's business while the same are being made, the tenancy is not terminated, or the lease forfeited", and held there was no right to terminate under the facts of the case.

The Court took into consideration the cost of the repairs, $2,600, in relation to the value of the building, $40,000, as well as the time needed to make repairs. In the case before us, the repairs cost some $5,000 in a building valued at over $100,000, and time needed to repair was not much longer than in *Barry v. Herring.*

The text writers and the Courts have used like tests in determining whether repairs are ordinary and, under circumstances such as those before us, have concluded, with substantial agreement, that there has been no such destruction as to justify the termination of the tenancy. In 2 *Underhill on Landlord and Tenant,* Sec. 792, p. 1349, the author says: "A provision in a lease that rent shall cease if the premises are destroyed, or that rent shall cease if they shall become untenantable by fire, means a substantial destruction and a permanently untenantable condition rendering further occupancy impossible and necessitating not merely repairs but rebuilding. Mere damage by smoke or water, rendering the occupation of the tenant unpleasant and inconvenient is not sufficient to bring the case under the stipulation." 1 *Tiffany, Landlord and Tenant,* 1912 Ed., p. 1225, referring to statutes relieving from the common law rule as to the effect of casualties on the rights of the parties to a lease, notes that there are New York cases to the contrary and says that since the statutes apply in terms only when a building is destroyed or so damaged as to be untenantable, "it is difficult to see how, in any case, the untenantable condition of the premises can be ground for relieving the tenant unless this condition results from the destruction of or injury to the building. On this view, the presence of odors or dampness, or the occasional flow of water on the premises, although this renders the premises untenantable, would not bring the case within the statute, unless the premises leased are by one of such causes so injured as to be untenantable. That is, there should, by the terms of the statute, be an injury to the building, and injury to the tenant's right of enjoyment merely would seem to be insufficient." For cases that agree entirely with Tiffany's reading of the statutes and similar provisions in leases, see *Scharbauer v. Cobean* (N. M.), 80 P. 2d 785; *Luis v. Ada*

*Lodge ♯ 3, Ind. Order of Odd Fellows* (Idaho), 294 P. 2d 1095; *Woodbury Co. v. Williams Tackaberry Co.* (Ia.), 148 N. W. 639; *Mottman Mercantile Co. v. Western Union Tel. Co.* (Wash.), 100 P. 2d 16; *Wall v. Hinds* (Mass.), 4 Gray 256; *Tedstrom v. Puddephat* (Ark.), 137 S. W. 816; *Clayton v. Perry* (Mass.), 176 N. E. 522, *supra; Booraem v. Morris* (N. J.), 64 A. 953; *Wampler v. Weinmann* (Minn.), 57 N. W. 157; *General Outdoor Advertising Co. v. Wilson,* 93 N. Y. S. 2d 131, *supra.* A number of cases are collected in the annotation in 118 *A. L. R.* 106.

The chancellor distinguished several of the cases cited, including *Barry v. Herring, supra,* on the facts, but it is our view that there can be no sound distinction. The large size and the value of the building, in relation to the small cost of restoration, the fact that Smith was not in occupancy and, therefore, "the purpose of the Lessee's business" was uninterfered with, as well as the fact that the lease had some ten months to run after the effects of Connie had been effaced, lead us to believe that the temporary unusability of the floor space was not a substantial destruction of the demised premises that justified termination of the lease. Smith would be entitled to an abatement of one month's rent on the basis of the chancellor's finding that the property was unusable for a month.

We see no merit or substance to Smith's claim for the rent it lost when Bendix, its sub-tenant, moved out. There is nothing to show how long Bendix would have remained a tenant if Connie had not come along. Indeed, there was testimony from Bendix officials that it was contemplating a very early removal. More pertinent than this consideration, which is not decisive, is the finding of fact by the chancellor that there had been no breach of duty, no omission or commission, by Standard which amounted to negligence or constructive eviction. On the assumption that there was a duty on the part of Standard to prevent the happening of what occurred, and on the assumption that there was negligence, the chancellor said: "* * * I find nothing in the testimony to show that any such assumed breach was a proximate cause of the damage that was here done. Connie was unprec-

edented, unpredictable. There is no evidence which convinces me that if the landlord had done everything which was suggested it do or which was ever talked about, irrespective of expense, that even such precautions, if they had been taken, would have prevented the damage which has been done in this case. That, gentlemen, is pure speculation, and legal responsibility cannot be predicated upon speculation." Smith has not suggested any sound reason why this finding of the chancellor was wrong and we think it was fully justified by the record. This finding disposes of the counter-claim and requires affirmance of so much of the decree as was appealed from by Smith.

> *Decree affirmed in part and reversed in part, and case remanded for passage of a decree in conformity with this opinion; costs to be paid by appellee and cross-appellant, Alexander Smith, Inc.*