MARCEL HAIR GOODS CORPORA-
TION, Appellant,

v.

NATIONAL SAVINGS & TRUST CO.
et al., Appellees.

No. 12460.

District of Columbia Court of Appeals.

Argued Dec. 6, 1978.

Decided Oct. 1, 1979.

Rehearing Denied Dec. 5, 1979.

Louis James Morse, Silver Spring, with
whom Milton M. Burke, Silver Spring and
Marc F. Silver, Silver Spring, were on brief,
for appellant.

Thomas Penfield Jackson, Washington, D.
C., for appellees.

Before NEBEKER, MACK and FERREN, Associate Judges.

FERREN, Associate Judge:

This case presents two questions: (1) A party makes a motion under Super.Ct.Civ.R. 50(a) for a directed verdict at the close of all the evidence, the court reserves the motion and submits the case to the jury, and the jury returns a verdict for the other party. Immediately the court conducts a hearing and rules on the reserved motion by granting a judgment n. o. v. Is the prevailing party entitled to that judgment (assuming it is sustainable on the merits), without having filed a motion for judgment n. o. v. under Super.Ct.Civ.R. 50(b)? (2) Under a provision of a commercial lease which permits the landlord to terminate a tenancy "if the demised are rendered wholly untenantable by fire or other cause," could a jury reasonably have reached a verdict only for the landlord under the proper interpretation of the lease and the facts of this case? We answer "yes" to both questions and affirm the judgment.

### I.

Appellant, Marcel Hair Goods Corp. (Marcel), entered into a written lease with appellees, National Savings & Trust (NS&T), trustee, and certain individuals, for the second, third, and fourth floors of a commercial building at 1215 Connecticut Avenue, N.W. The lease was for a ten-year period (February 1, 1963–January 31, 1973) at $1,250 per month and granted Marcel a renewal option for two five-year periods. Marcel located its wig and hairpiece business on the fourth floor; it subleased the second floor to a dress shop for $900 per month and the third floor to a beauty shop for $675 per month.

On November 24, 1971, a fire completely destroyed the roof of the premises, did severe damage to the fourth floor, and caused smoke and water damage to the second and third floors. The electrical, plumbing, and heating systems were left completely inoperative. According to the testimony of Marcel's witnesses, the fire damaged thirty percent of the building, and under the District of Columbia Building Code no one could have occupied it lawfully, let alone safely. Soon after the fire, Marcel rented space for its own business in a nearby building. On January 10, 1972, Marcel received a letter from NS&T exercising the landlord's option to terminate the lease under the "fire clause" of the lease:

24. That *if the demised premises shall be partially damaged by fire or other cause,* without the fault or neglect of TENANT, or its servants, employees, agents, visitors or licensees, *LANDLORDS, at their election, may rebuild and restore said premises. In the event LANDLORDS elect to rebuild and restore said premises the rent until such repairs shall be made shall be apportioned according to the part of the demised premises which is usable by TENANT.* Due allowance shall be made for reasonable delay which may arise by reason of adjustment of fire insurance on the part of the LANDLORDS and/or the TENANT, and for reasonable delay on account of "labor troubles" or any other cause beyond the LANDLORDS' control. *But if the demised premises are rendered wholly untenantable by fire or other cause, and the LANDLORDS should decide not to rebuild the same, or if the building shall be so damaged that the LANDLORDS should decide to demolish it or to rebuild it, then or in any of such events the LANDLORDS may, at the LANDLORDS' option, give TENANT a notice in writing of such decision, and thereupon the term of this Lease shall expire by lapse of time upon the third day after such notice is given and the TENANT shall vacate the demised premises and surrender the same to LANDLORDS. In neither of the contingencies in this paragraph mentioned shall there be any liability on the part of the LANDLORDS to TENANT, its successors or assigns.* In the event the demised premises are rendered untenantable as above provided the liability of the TENANT for

the payment of rent shall thereupon cease. [Emphasis added.] [1]

After receiving the letter, Marcel cancelled its two subleases.

In March 1972, NS&T began to restore the building, without structural change. The contractor had to replace much of the plumbing (which had been warped by heat), the heating and air conditioning equipment (which had rusted), and the electrical ·wiring (which had burned on the third and fourth floors). He also straightened and reinforced the steel beams and replaced the entire roof, the plaster on the walls and ceilings, the light fixtures, and the warped floor. Work was completed in July 1972 and approved by the building inspector in August.

Having learned that the building was to be restored and placed once again on the market, Marcel demanded on March 13, 1972, and again on July 10, to reoccupy the premises once completed.[2] The landlords refused. Marcel accordingly filed suit for breach of contract in the United States District Court for the District of Columbia in June 1973, claiming damages of $162,000, represented in part by loss of rental income from subtenants and the full rental value of its own premises ($106,000 over an eleven-year period) and loss of business value ($50,-000). The case was certified to the Superior Court on March 10, 1975.

The case was tried before a jury on July 6 and 7, 1977, and at the close of plaintiff's case, appellees moved for a directed verdict pursuant to Super.Ct.Civ.R. 50(a). The motion was denied. Appellees renewed the motion at the close of all the evidence. The trial judge took the motion under advisement and sent the case to the. jury, which returned a $100,000 verdict for Marcel. Immediately after the verdict—and after hearing argument—the court ruled on the previously-reserved motion for directed verdict, granting appellees a judgment n. o. v. In the alternative, the court sua sponte granted a new trial in the event that the judgment n. o. v. was reversed on appeal.

## II.

At the time the trial court granted the judgment n. o. v., appellees had not made a motion pursuant to Super.Ct.Civ.R. 50(b).[3]

1. The written notice from the landlords stated:

A thorough examination of the premises 1215 Connecticut Avenue, N.W., and a review of all the data relating to restoration of the building, discloses that the damage done by the fire of November 24, 1971, appears to have been of such an extent that we must exercise the Landlords' option to terminate the lease in accordance with Paragraph 24 thereof.

Thus, you may regard your lease as having terminated on the third day following the date hereof, and your liability for rent as having ceased.

We assume you have removed all of your salvageable items of personal property from the premises. If you have not, you should do so at once, because we expect wreckers will begin removing the debris within a week and may inadvertently pick up such items with the wreckage.

If and when the building is reconstructed in a form suitable for retail trade, and you should like an opportunity to occupy the location once again, please let us know. We will be glad to advise you when the space is returned to the market.

2. Marcel apparently contended that it had rented space at a new location only because NS&T had indicated soon after the fire that the building would be razed.

3. Super.Ct.Civ.R. 50(b) provides:

(b) MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT. Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. ' A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict

Marcel accordingly relies on *Johnson v. New York, New Haven and Hartford Railroad Co.,* 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77 (1952), for the proposition that Fed.R. Civ.P. 50(b)—and thus Super.Ct.Civ.R. 50(b), which is identical to the federal rule —"forbids the trial judge or an appellate court to enter such a judgment" if a rule 50(b) motion was not made in the trial court within 10 days after the verdict. *Id.* at 50, 73 S.Ct. at 127 (citing *Cone v. West Virginia Pulp & Paper Co.,* 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1947)).

In *Johnson, supra,* the respondent moved for a directed verdict after the close of all the evidence. The trial court reserved decision on the motion and submitted the case to the jury, which returned a verdict for the petitioner. The respondent moved to have the verdict "set aside." Two months later, the court denied this motion and the preverdict motion for a directed verdict. The court of appeals reversed, holding that a directed verdict should have been granted. The Supreme Court addressed only the issue "whether the *Court of Appeals* could direct such a judgment consistently with Rule 50(b) of the Federal Rules of Civil Procedure." *Id.* 344 U.S. at 50, 73 S.Ct. at 126 (emphasis added) (footnote omitted). The Court stated that the respondent's motion to set aside the verdict could not be treated as a motion for judgment n. o. v. *Id.* at 51, 73 S.Ct. 125. It examined rule 50(b) and concluded that because respondent had not made a timely motion in accordance with the rule, the appellate court had no power to render judgment in respondent's favor, even though the trial court had reserved ruling on the motion for directed verdict at the end of the evidence. Four judges dissented, criticizing the majority for its excessively narrow reading of rule 50(b). *See* 9 Wright & Miller, Federal Practice & Procedure, Civil § 2537, at 604– 05 (1971), 5A Moore's Federal Practice, ¶ 50.09, at 50–94 to 95 (2d ed. 1979).

Some federal circuit courts have interpreted the *Johnson* ruling narrowly.[4] For instance, in *Shaw v. Edward Hines Lumber Co.,* 249 F.2d 434 (7th Cir. 1957), the United States Court of Appeals for the Seventh Circuit, dealing with a case similar to the present one, limited *Johnson, supra,* to a ruling that an *appellate court* has no power to direct entry of a judgment n. o. v. on the basis of a party's motion for a directed verdict, where the party had not sought a judgment n. o. v. and, after the jury verdict, the trial court had *denied* the party's preverdict motion for a directed verdict. The court then held that where the trial judge had reserved the preverdict motion, counsel had renewed that motion after verdict, and the court had held a hearing on the post-verdict motion, the trial court had the power to set aside the jury verdict and enter judgment in accordance with defendant's motion for directed verdict. *Id.* 438– 39. The court explained that there was a critical difference between a trial court's decision to take such action and an appellate court's directive that the trial court enter such a judgment after the trial court's earlier denial of a directed verdict. Where a trial court takes the action, it is in a position, at the same time, to consider whether a new trial may be more appropriate under the circumstances. In contrast, an appellate court directive for a judgment n. o. v. would prejudice the winner of the jury verdict by preventing the trial court from exercising its discretion to decide whether a new trial should be granted instead. *Id.; see Gilbert v. Cliche,* 379 A.2d 717, 721 & n. 3 (Me.1977).

The United States Court of Appeals for the First Circuit has also distinguished *Johnson, supra.* In *First Safe Deposit National Bank v. Western Union Telegraph Co.,* 337 F.2d 743 (1st Cir. 1964), a case almost identical, procedurally, to the present one, the circuit court held that during the 10-day period in which a motion for judgment n. o. v. would be proper, the trial

was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial.

4. *But cf. Gilbert v. Cliche,* 379 A.2d 717 (Me. 1977) (Maine Rule 50(b) requires timely motion for judgment n. o. v.).

court could rule on its reserved motion for a directed verdict and order entry of judgment n. o. v. *Id.* at 746; *see Phibbs v. Town-O-Tel Courts, Inc.,* 201 S.E.2d 616 (W.Va.1973).

Professor Moore's treatise has stated that these decisions limiting *Johnson, supra,* express a proper limitation on the *Johnson* rule, and that if the trial court were not given such power, the provision for reservation of decision would become meaningless, except where the jury had been unable to reach a verdict and the court had then ruled on the reserved motion. Moore, *supra* at 50, 94 to 95. To the contrary, Wright & Miller, *supra,* maintains that these decisions interpreting *Johnson* in a way that limits only the power of the appellate court, not the trial court, to enter judgment n. o. v. (absent a rule 50(b) motion) "fly in the face of the language of the *Johnson* case," which refers to both trial and appellate judges, and "cannot be defended." Wright & Miller, *supra* at 604–05.

■ We conclude that the narrow interpretation of *Johnson, supra,* advocated in Moore, *supra,* and implemented by *Shaw, supra,* and *First Safe Deposit National Bank, supra,* is the better one for the circumstances of this case. In the first place, we read *Johnson's* reference limiting the trial court's authority as dictum. *See First Safe Deposit National Bank, supra* at 746. Moreover, unlike the situation in *Johnson,* the trial court here gave Marcel a hearing before entering judgment n. o. v. for appellees. Furthermore, the court protected Marcel's procedural rights by granting a new trial in case the judgment n. o. v. were overturned on appeal. Finally, because the trial court had already granted a judgment n. o. v., appellees had no practical reason to make a motion under rule 50(b).

In this situation, therefore, every protection which the Supreme Court has attributed to rule 50(b) in *Johnson* has been afforded to Marcel. We would be insisting on form over substance if we were to reverse the judgment n. o. v. (if it is otherwise warranted) and order a new trial. To hold a party accountable for failing to interject a rule 50(b) motion when the trial court conducts a post-verdict hearing on a reserved rule 50(a) motion would be irrational. Super.Ct.Civ.R. 1 directs that the rules be "construed to secure the just, speedy, and inexpensive determination of every action." Interpreting Rule 50(b) narrowly to prohibit an action like the trial court took in this case would not promote these purposes; rather, it would require remanding the case for a useless new trial because a party had not complied with a procedural technicality, the purpose for which has been achieved through a hearing and alternative ruling for a new trial. The trial court's ruling here does not prejudice Marcel's procedural rights; accordingly, we acknowledge the trial court's authority to enter a judgment n. o. v. in this situation.[5]

### III.

■ In reviewing a trial court order granting a judgment n. o. v., this court must view the evidence and all reasonable inferences in the light most favorable to the party who obtained the jury verdict; we may affirm only if no juror could reasonably reach a verdict for the opponent of the motion. *See McKnight v. Wire Properties, Inc.,* D.C.App., 288 A.2d 405, 406 (1972). This does not mean, however, that the court may ignore uncontradicted evidence supporting the appellee's position. *Shaw, supra* at 439.

■ The central question here is whether the fire rendered the premises "wholly untenantable" within the meaning of the fire

5. Although our holding depends in part on the opportunity for the party who prevailed before the jury to argue for a new trial in lieu of a judgment n. o. v., it is not affected by whether the trial court does—or does not—grant a new trial, in the alternative, in the event that the judgment n. o. v. is reversed on appeal. However, because this opinion necessarily alludes

several times to the trial court's alternative order for a new trial, we believe it is desirable to address that practice explicitly and indicate our approval. It is consistent with Super.Ct. Civ.R. 59(d) and may be used within the sound discretion of the trial court. *See Baber v. Buckley,* D.C.App., 322 A.2d 265, 266–67 (1974).

clause (paragraph 24) of the lease. If so, the landlord had the right to terminate the lease and Marcel's action must fail. Courts have defined untenantability in terms of fitness for occupancy, not the percentage of damage or destruction done to a building. *See Old Line Co. v. Getty Square Department Store, Inc.,* 66 Misc.2d 825, 827, 322 N.Y.S.2d 149, 152 (1971). As a general rule, a building is deemed to be wholly untenantable if it cannot be used for the purposes for which it was leased and cannot be restored, using ordinary repairs, without unreasonable interruption of the tenancy. *See, e. g., Luis v. ADA Lodge # 3, Independent Order of Odd Fellows,* 77 Idaho 392, 396, 294 P.2d 1095, 1098 (1956); *Kouzoukas v. Chamopoulos,* 133 Ill.App.2d 14, 17, 268 N.E.2d 261, 264 (1971); *Barry v. Herring,* 153 Md. 457, 461–62, 138 A. 266, 268–69 (1927); *Old Line Co., supra* at 827, 322 N.Y.S.2d at 152; *Mottman Mercantile Co. v. Western Union Telegraph Co.,* 3 Wash.2d 62, 66, 100 P.2d 16, 17–19 (1940).[6]

■ Applying this standard—which, fairly construed, the lease contemplates here[7]

—we conclude that the jury could not reasonably find for the tenant, even when viewing the evidence in the light most favorable to Marcel. The evidence unquestionably demonstrates that the building was seriously damaged by the fire. Until the roof, steel structures, wiring, and plumbing were repaired and the floors and walls were restored, the building was unsafe and legally unfit for occupancy. The restoration took three to four months; and the building was not ready for occupancy until after the massive repairs had been completed in July 1972 and approved by the building inspector a month later, approximately nine months after the fire. Under these circumstances, no reasonable juror could have found the premises to be other than wholly untenantable. The trial court properly entered judgment n. o. v. for appellees.

*Affirmed.*

6. The trial court instructed the jury that for premises to be wholly untenantable, there must be "a substantial destruction of property rendering further occupancy impossible and not necessitating merely repairs, but rebuilding." The court continued, explaining that the phrase "means not fit or safe to be rented or occupied by a tenant. Mere damage by smoke or water rendering the occupation . . . [inconvenient] is not sufficient." These instructions are generally consistent with the majority of cases dealing with this question; however, the court's statement that the jury must find "further occupancy impossible" is ambiguous. It is unclear whether the court meant that the jury could find the premises wholly untenantable only if the tenant could never again use them (absent razing and rebuilding) or if the court instead meant that the jury need only find that the damage made further occupation of the building in its present condition impossible. Although there is language in some cases supporting the former definition, *see Standard Industries, Inc. v. Alexander Smith, Inc.,* 214 Md. 214, 133 A.2d 460 (1957); *Scharbauer v. Cobean,* 42 N.M. 427, 80 P.2d 785 (1938), the better and more commonly used rule is that stated in the text above. In any event, because the judgment n. o. v. was properly granted, the particular form of the jury instruction here is not germane to our decision.

7. At oral argument, counsel for appellant acknowledged that, under the circumstances, appellees could have razed the building and sold the property for a parking lot, presumably terminating the tenancy thereby. Query whether paragraph 24 of the lease (quoted in the text above) would permit such termination if, as appellant contends, the premises here were only "partially damaged" rather than "wholly untenantable"? It would appear, from paragraph 24, that the term "partially damaged" premises contemplates continued occupancy by the tenant in "the part of the demised premises which is usable," albeit at a reduced rent, whereas the term "wholly untenantable" premises contemplates vacation of the premises by the tenant for some period of time, in which case the landlord—and arguably the tenant—can terminate the lease, irrespective of the landlord's plans for the property after the casualty. Under a definition to the effect that "wholly untenantable" means the premises can never again be used without razing and rebuilding, the landlord under paragraph 24 arguably could hold onto Marcel under the circumstances here for nine months (presumably at no rent), on the ground that the premises were only "partially damaged," and force Marcel to resume occupancy of the restored premises against its will for the balance of the term. Such a result does not appear to have been contemplated by the parties.