DISTRICT OF COLUMBIA, Appellant,

v.

Bobby Lee MITCHELL, Appellee.

Bobby Lee MITCHELL, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

Nos. 84-1299, 84-1471.

District of Columbia Court of Appeals.

Argued Nov. 26, 1985.

Decided Nov. 16, 1987.

Richard B. Nettler, Asst. Corp. Counsel at the time of argument, with whom Inez Smith Reid, Corp. Counsel at the time the brief was filed, John H. Suda, Principal Deputy Corp. Counsel at the time the brief was filed, Charles L. Reischel, Deputy

Corp. Counsel, and Lutz Alexander Prager, Asst. Corp. Counsel, Washington, D.C., were on the brief, for appellant, cross-appellee.

Samuel M. Shapiro, with whom David S. Greene and Cassandra P. Hicks, Rockville, Md., were on the brief, for appellee, cross-appellant.

Before FERREN, BELSON, and STEADMAN, Associate Judges.

FERREN, Associate Judge:

Bobby Lee Mitchell, an inmate at Lorton Reformatory, sued to recover damages for injuries allegedly caused by the District of Columbia's negligence in three unrelated occurrences: (1) in July 1979, District employees allegedly failed to secure a ventilation cover in a Lorton dormitory ceiling, causing it to fall on Mitchell's neck and shoulders (count I of the complaint); (2) the District allegedly failed to provide proper treatment following Mitchell's surgery in May 1980 for a ruptured hernia (count II); (3) the District allegedly failed to supervise and control inmates at the Lorton Central Facility, resulting in an inmate's assault on Mitchell in June 1982 (count III). In June 1984, after a seven-day trial, the jury returned verdicts for Mitchell on all three counts totaling $300,000—count I, $150,000; count II, $50,000; and count III, $100,000.

Both the District and Mitchell have appealed from the trial court's order of August 22, 1984, which (1) denied the District's motion for judgments n.o.v. on counts I and III; (2) granted the District's motion for judgment n.o.v. on count II; and (3) denied Mitchell's motion for assessment of interest on the judgment at the prevailing rate instead of 4%.

On appeal, the District contends: (1) the District is entitled to a new trial on counts I and III (and on count II if the judgment n.o.v. is not sustained) because the court misinstructed the jury on proximate cause; (2) the court erred in refusing to grant the District's requests for (a) contributory negligence and assumption of risk instructions on count I, and (b) a cautionary instruction on Mitchell's missing witness argument on count III; (3) the court erred in refusing to allow District medical and correctional employees to testify about their personal knowledge, respectively, of (a) Mitchell's medical condition (count II) and of (b) inmate control at Lorton (count III), because the court erroneously ruled that the District was required to list them in the pretrial statement as expert witnesses; and (4) the court abused its discretion in refusing to grant the District's request for a continuance when a material witness became ill shortly before trial.

In his cross-appeal, Mitchell asserts the trial court erred in (1) granting the judgment n.o.v. on count II and (2) in rejecting his argument that D.C. Code § 28-3302(b) (1987 Supp.) violates the equal protection guarantee inherent in the due process clause of the fifth amendment, in that it limits interest on judgments against the District to 4% while providing for interest at the prevailing rate on all other judgments.

We affirm as to counts I and III; we reverse and remand for a new trial on count II; and we affirm the trial court's denial of Mitchell's motion for interest at the prevailing rate instead of 4%.

I.

*Count I*

On July 2, 1979, a ventilation cover fell from the ceiling on Mitchell as he was leaning over a desk in his dormitory while talking with another inmate. Thomas Elder, also an inmate, had heard a "ventilation fan kick on," seen the ventilation cover fall, and yelled to Mitchell to look out. The cover nonetheless struck Mitchell on his neck and shoulders. Mitchell fell to the floor; other inmates took him to the Lorton Infirmary. He was then transported to D.C. General Hospital for treatment. Mitchell testified that his neck, shoulders, and back had continued to hurt since the ventilation cover struck him. He said he no longer could play sports, work in the furniture repair shop, or sit up for long periods of time.

*Count II*

Wholly unrelated to the ventilation cover incident, Mitchell developed a swelling in his abdominal area which led to a hernia operation at D.C. General Hospital in 1980. Mitchell complains about the medical services he received after this operation, when he developed an infection at the incision site. The infection was treated by periodic cleaning, antibiotics, and hot compresses but did not heal. In April 1981, doctors at D.C. General recommended exploratory surgery. Although scheduled, the surgery was never performed. Dr. David Robb, whom the court certified as an expert in family medicine, testified for Mitchell that "the level of care was below the competence that could be expected in a situation like this."

*Count III*

On June 8, 1982, at approximately 10:45 a.m., Henry Moore, another inmate, allegedly assaulted Mitchell with a lead pipe while Mitchell stood in an area outside the dormitory. According to Mitchell, he had seen Moore pouring coffee out of another inmate's coffee pot earlier that morning and had told Moore not to do so. Mitchell was struck on his wrist, ribs, and thumb, as well as on his left leg, which was broken during the incident. He was treated at D.C. General Hospital for three weeks, and a cast was placed on his leg for six months. Mitchell testified that, since the incident, he

had had severe pain and stiffness in his leg and ankle. E. Eugene Miller, a penologist, testified for Mitchell. He acknowledged that the reformatory had complied with its own procedures, including shakedowns, and that no institution could be weapon free. But he opined, nonetheless, that the reformatory did not provide reasonable care and custody because it failed adequately to supervise the inmates.

## II.

On appeal, the District asserts the right to a new trial on all counts (except count II if we sustain the j.n.o.v.) because the trial court misinstructed the jury on proximate cause. Specifically, the District claims the court "inevitably confused" the jury when it gave three inconsistent instructions on proximate cause, two of which were incompatible with *Lacy v. District of Columbia,* 424 A.2d 317 (D.C.1980). The District says, more specifically, that the court should have defined proximate cause, in accordance with the instructions proposed by both parties, to include the "substantial factor" test and should have applied this test to all three counts.[1] Mitchell replies that the District failed to preserve this issue for appeal; Super.Ct.Civ.R. 51 bars the District, he says, because it failed to raise any specific objection, either before or after the jury was instructed, to the court's instructions on proximate cause.[2]

---

**1.** Both parties had submitted proposed jury instructions using "substantial factor" language. In accordance with *Lacy v. District of Columbia,* 424 A.2d 317 (D.C.1980), standardized Civil Jury Instructions for the District of Columbia, No. 5–11 (revised ed. 1981), provides in part: "An injury or damage is said to have been proximately caused by an act, or a failure to act, whenever it appears ... that the act or omission played a *substantial* part in bringing about the injury or damage." (Emphasis added.)

Before instructing the jury on the three separate counts, the court instructed generally on proximate cause: "Whenever it appears from a preponderance of the evidence that the act or omission played a part in bringing about the injury or damage, ... that's proximate cause." The court then instructed the jury on count I. Consistent with its general instruction, the court told the jury that it could return a verdict for Mr. Mitchell if it found that the District was responsible for creating a dangerous condition and that Mitchell's injury was a proximate re-

sult of the dangerous condition. Similarly, on count II, the court told the jury it could find the District negligent if Mitchell "suffered injuries or damages as a result of the District's failure to provide adequate and necessary treatment and care ...," and it could find for the District if Mitchell's refusal "was the proximate cause of his injury." The court instructed the jury on count III, however, in conformity with *Lacy* and standardized instruction 5–11, that an "injury or damage is said to have been proximately caused by an act or a failure to act whenever it appears from a preponderance of the evidence the act or omission played a *substantial part* in bringing about the injury or damage." (Emphasis added.)

**2.** Super.Ct.Civ.R. 51 provides in the relevant part:

No party may assign as error the giving of or failure to give an instruction unless he [or she] objects thereto before the jury retires to

## A.

The court and counsel did not discuss proximate cause during their initial colloquy on jury instructions. Immediately before the court read the instructions to the jury, however, the District objected "as to any departures from our proposed jury instructions." The court replied, "[T]hat's automatic." After the court had read the instructions to the jury, he asked counsel if they had any objection. The District's counsel replied, "No new ones. We renew all the prior."

Later, after the jury had retired, the jury sent the court a note asking whether count II was "a malpractice suit, negligence, or both." The court informed counsel that it proposed to inform the jury that count II was only a negligence claim and then to reinstruct on the elements of a negligence action, including proximate course, contributory negligence, and injury. District counsel clarified: "[Y]ou will give the four points that you gave yesterday." The court replied "Yes," and both counsel added that they had "no objection."

The court then reinstructed, in part, as follows:

Now, in order to recover, this is what Bobby Lee Mitchell must show by a preponderance of the evidence: That the District of Columbia had knowledge of the medical or health care need that he had; two, that the District of Columbia had a reasonable opportunity to provide the needed medical treatment and care; three, that they failed to provide it and they failed to provide adequate necessary treatment and care. They failed to provide necessary and adequate treatment and care. And finally, and this is very important as each one is, that as a result of their failure to provide it, he suffered injuries or damages, and that Bobby Lee Mitchell suffered injuries or damages as a result of the District of Columbia's failure to provide adequate and necessary treatment and care. Those are the four things that he must show.

Now, the District says the reason you're in the condition that you are in is that because you refused to take the treatment. And I spoke to you in reference to this about what we call contributory negligence or assumption of risk. Any time a person is injured because of their own contributory negligence or because they assume a known risk that he didn't have to assume, they can't recover from somebody else for what happens to them. So, it is necessary that Bobby Lee Mitchell prove that the District was negligent, and that as a result of that negligence, he was injured or damaged. And the burden of proof is on the District to prove contributory negligence or assumption of risk. It isn't just sufficient to prove negligence. You must prove that as a result of that negligence, he suffered some damage or risk.

The same thing with assumption of risk and contributory negligence. It isn't sufficient that the District just prove by a preponderance of the evidence that he assumed the risk or that he was contributorily negligent. He must also prove proximate cause that as a result of that contributory negligence or assumption of risk it contributed to his condition, there was *substantial contribution* as a result that—that was *substantial contribution* to his condition. [Emphasis added.]

After the jury had resumed deliberations, there was a discussion among the court and counsel during which counsel for the District objected to the reinstruction. Counsel questioned the court's reference to "substantial contribution" in the contributory negligence portion of his reinstruction. The court replied, "You tell me if I'm wrong and I'll act accordingly."

Court and counsel then discussed at length whether *Lacy* required "substantial factor" language in a proximate cause instruction. The court focused initially on its belief that *Lacy* did not require reference to a "substantial factor" in defining proximate cause unless concurrent causes were

consider its verdict, stating distinctly the matter to which he [or she] objects and the

grounds of his [or her] objection.

at issue.[3] The court then recognized that, because contributory negligence was an issue in count II, the proximate cause instruction with respect to both negligence and contributory negligence should be consistent. The court remarked to counsel for the District: "If you're saying I didn't say the same thing with reference to negligence [and contributory negligence], ... then I want you to make that known so that I can be sure and say the same thing."

Counsel for the District replied, "No, it's not my recollection that you didn't say the same thing." (Counsel was mistaken; neither in the original count II instruction on proximate cause, nor in the reinstruction, did the court use the word "substantial," except with reference to proximate cause as part of the contributory negligence reinstruction.) Counsel's objection, rather, was that although the court had included a correct "substantial factor" definition of proximate cause within the reinstruction on contributory negligence, the court had failed to stress that proximate cause is a separate concept. Accordingly, said counsel, there was a danger that the jury would believe a greater degree of negligence by Mitchell was required to support the District's defense of contributory negligence than was required for Mitchell to sustain its claim of negligence against the District.

Counsel for Mitchell then stated:

May it please the Court, so that this record is very, very clear, as I understand what counsel has just said, he is not saying that you did not use the word "substantial" in both the negligence and the contributory negligence and assumption of risk cases equally. He is saying that the way that it's juxtaposed to contributory negligence and assumption of risk is what he objects to.

[Government Counsel]: That's the substance of my objection.

The Court: Okay.

[Mitchell's Counsel]: Then I would respectfully submit that the Court had done properly and it should be left exactly where it is now.

The Court: That's exactly what I'm going to do, sir.

Both counsel then replied, "Thank you."

### B.

On appeal, the District has enlarged its original objection. The District now complains that the proximate cause instructions relating to all three counts were erroneous because they omitted reference to the "substantial factor" requirement of *Lacy*. The District, however, has not preserved this broader issue for appeal. At trial, before the jury retired, the District objected generally to any deviation from its proposed instructions; and, after the reinstruction on count II, the District objected specifically to the court's use of "substantial" in close proximity to the definition of contributory negligence. The general objection did not satisfy Super.Ct.Civ.R. 51, *supra* note 2, for the purpose of challenging the proximate cause instructions on appeal, for it did not state "distinctly the matter to which [the District] object[ed] and the grounds of [the] objection." The objection to the reinstruction, while specific enough, did not preserve the issue now before us because it is not the error cited on appeal.

In *Ceco Corp. v. Coleman*, 441 A.2d 940, 954 (D.C.1982), we held that the failure to comply with Super.Ct.Civ.R. 51 prevented us from noticing any error in the trial court's instruction at issue. We said that the "purpose of this rule is to give the trial judge an opportunity to reconsider and, if necessary, correct his [or her] proposed charge." *Id.* at 947 (citations omitted). Objections must be " 'sufficiently specific to bring into focus the precise nature of the alleged error.' " *Id.* (quoting *Palmer v.*

---

**3.** This interpretation explains why the court omitted "substantial factor" language from the proximate cause instruction on count I, the ceiling vent, where the court declined to give a contributory negligence instruction. The court did, however, use "substantial factor" in its instruction on count III, the assault. *Supra,* note

**1.** The court said it had done so because there were concurrent causes in count III. The court did not give a contributory negligence instruction on that count, so perhaps the court reasoned that the concurrent causes were Moore's alleged attack and the District's alleged failure to supervise and control.

*Hoffman,* 318 U.S. 109, 119, 63 S.Ct. 477, 483, 87 L.Ed. 645 (1943)). Neither the District's general objection nor its specific objection to the placement of the term "substantial" in close proximity to the contributory negligence instruction sufficed to apprise the court of the District's present, broader objection raised for the first time on appeal: that the court "inevitably confused" the jury when it gave three inconsistent instructions on proximate cause—one mentioning "substantial factor" while two did not. *See id.* (citing *Rogers v. Northern Rio Arriba Electric Cooperative, Inc.,* 580 F.2d 1039, 1042 (10th Cir. 1978)).

■ We also noted in *Ceco* that we have "on occasion considered error raised for the first time on appeal where 'it is apparent from the fac[e] of the record that a 'miscarriage of justice' has occurred.'" 441 A.2d at 947 (quoting *Weisman v. Middleton,* 390 A.2d 996, 1000 (D.C.1978)). We do not believe this is such a case. In the first place, although the trial court did use the term "substantial" in the charge on count III and in the contributory negligence part of the reinstruction on count II, no one— court or counsel—emphasized that term to the jury. The jury indicated its confusion on the malpractice issue by sending a note to the court. The jury presumably would have done the same if it had perceived instructional differences as to proximate cause.

Furthermore, counsel had ample opportunity to obtain any desired reinstruction and failed to do so. Counsel and the court discussed the implications of *Lacy,* for the first time, over pages and pages of transcript after the court had reinstructed on count II. It is absolutely clear from this discussion that the court—which was most solicitous of the District's concerns—would have reinstructed the jury a second time on count II if the District's counsel had recalled an error in the proximate cause instructions themselves, in contrast with the expressed concern about incorporation of a proximate cause definition into the contributory negligence instruction.

Finally, the trial court at this time also expressly stated why it had used "substantial factor" language in count III, but not in count I. *Supra,* note 3. Even with that opening, counsel for the District remained silent as to the *Lacy* issue now advanced on appeal. In view of this virtually invited opportunity for *de novo* reinstruction if necessary, the District cannot properly rely on its original, general objection. In light of the subsequent colloquy, we perceive no miscarriage of justice in deeming that general objection waived.

Because the District had ample opportunity to ask for correction of all three instructions at trial but did not, and, in any event, because the differences in instructions were slight, no "miscarriage of justice" has occurred.[4]

### III.

The District also contends the trial court erred in refusing to grant its request for jury instructions on contributory negligence and assumption of risk on count I, the falling ventilation cover. The District argues that a reasonable juror could have found that Mitchell failed to exercise reasonable care (1) when he leaned over the desk under the ventilation cover at a time when he knew the cover had not been properly re-installed or, in any event, (2) when he failed to report the existence of that dangerous condition.

### A.

In the Central Facility at Lorton, inmates are housed in dormitories. The ventilation covers in Mitchell's dorm ran along the center of the ceiling above the walkway between the beds. The desk was located between two beds in the middle of the dorm.

Mitchell testified he knew that ventilation covers were taken down during shakedowns and that the bolts were not replaced

---

4. Even if the District implicitly has appealed, as a protective measure, the court's refusal to reinstruct on count II in accord with counsel's nar- rower, specific objection at trial, that issue is now moot in view of our reversal and remand for a new trial on count II.

properly. "I knew they were not sufficient, that's why I was complaining. I reported them to the officials that were there because we don't know whether [the bolts were] sufficient up there." When asked if he had known the ventilation cover might be dangerous, Mitchell replied, "I knew all of them has a possibility of being dangerous. But once you live around something like that, ... you see them hanging like that, you just don't go around every day and duck them. You get lax to the point that it ain't [fell], so if it falls just accident, you don't expect it to fall on you."

Mitchell testified that he had complained about the ventilators to Officer Cook on several occasions before the accident. He also testified that Thomas Elder, another inmate, had given Mitchell an administrative report form which Mitchell, as dorm representative, had passed on to Cook. Mitchell said that Cook had told Mitchell he would turn the form over to the maintenance man, but that Cook also had told Mitchell the inmates should stop storing homemade wine (commonly called "shoots") up in the vent ducts. Mitchell also testified that maintenance men had worked on the ventilation system and had removed that particular cover after he had complained to Officer Cook, but before the accident. Mitchell maintained that only three screws had held the cover to the ceiling before it struck him in July 1979.

Thomas Elder, a resident of the dormitory, testified that he had complained about the ventilation ceiling covers to Lieutenant Haywood and to Mr. Krause, and that early in June 1979 he had submitted an administrative remedy procedure form which was delivered to Lieutenant Haywood. Elder also noted that the vent ducts had been cleaned "near the end of June," before Mitchell's accident, but that the maintenance men had put the grate back with only two screws. Elder stressed he had complained that someone was going to get hurt, but they had "just left them up there like that" and no further repairs had been made before July 2, 1979, the date of Mitchell's accident.

Officer Cook testified for the District. He was the "squad officer" assigned to Mitchell's dormitory. He was responsible for moving residents, assuring the dorms were clean, conducting "shakedowns," maintaining security, and calling management about "certain items ... brought to my attention." He clarified that he was responsible only for cleaning, not maintenance, which was performed by "management." But he stressed that he was "responsible for calling in maintenance, telling facility management," and that 90% of the time he would be the one to receive inmate complaints and call them in. Ventilator problems, he added, would always be turned over to management.

Cook further testified that he had spoken with Mitchell two weeks after Mitchell had come back from the hospital following his accident. He had asked Mitchell what had happened, and Mitchell had described the incident. According to Cook, Mitchell had explained

how the residents are in the dorm especially that Woody, ... they make shoots [wine] and they stick their buckets of shoots up in this duct. He [Mitchell] said that he [Woody] had taken a duct loose to put his shoots in, and when he reinstalled it, he only put three, put four bolts back in. I [Cook] said ... didn't he know it could turn loose? He [Mitchell] said yes, but you know how they are, they had to have a quick and easy access to this duct so when it's ripe, it's got to be taken out of there.

Cook also testified that Mitchell had said he would like to sue Woody but "residents don't have money." Cook maintained that neither Elder nor Mitchell had complained about the vent problem before the accident and that no one had given Cook an administrative procedure form indicating there was something wrong with the vents in the dormitory. Such a form, he said, goes directly to the administrator or to the superintendent. "It bypasses the officer and all the maintenance people below them." Ordinarily, a resident prepares the form and asks the squad officer for a pass to go to the Administration Building. Mitchell had not asked Cook for a "call up or pass"

for that purpose. Cook testified that the last regular shakedown of Mitchell's dorm in which he participated, when the vent covers were removed, had occurred "approximately a month"—in "May or June"—before the July 2, 1979 accident.

B.

■ "Assumption of risk is an available defense when a plaintiff voluntarily has incurred a known risk." *Scoggins v. Jude,* 419 A.2d 999, 1004 (D.C.1980) (citing RESTATEMENT (SECOND) OF TORTS § 496E, comment a. (1965); other citations omitted). The key word is "voluntarily." *Id.* "If a tenant, for example, has no reasonable alternative to remaining on the premises, he or she cannot be said, in fairness, to have made a voluntary decision to encounter the risk [of housing code violations] there." *Id.* Most commonly, this defense "means voluntary exposure to a reasonable risk; *e.g.,* attendance at a baseball game, where balls are hit sharply into the stands." *Id.* (citation omitted).

In contrast, contributory negligence is "unreasonable conduct," *i.e.,* "conduct 'which falls below the standard to which a plaintiff should conform for his [or her] own protection' and contributes to the plaintiff's injury." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 463 When a situation may be considered a "voluntary exposure to an unreasonable risk," *id.,* thereby merging the principal elements of each defense, we arbitrarily classify this hybrid, by reference to unreasonable risk-taking, as a type of contributory negligence. *Id.* The standard for determining whether an instruction on either defense is required is whether a juror reasonably could conclude that the plaintiff was contributorily negligent or had voluntarily assumed a reasonable risk. *See Lewis v. Merzell,* 117 A.2d 392, 393 (D.C.1955).

District counsel explained to the trial court why he believed both instructions were appropriate: (1) Mitchell admitted leaning over the desk under the ventilation cover, which he admittedly knew was loose and dangerous; this was unreasonable conduct and thus evidence of contributory negligence. (2) Because there was conflicting testimony as to whether Mitchell had reported the loose ventilation cover, there was a basis for the jury to believe Mitchell had assumed the risk of injury attributable to his failure to do so.

■ In evaluating these contentions, we begin with the fact that pursuant to statute, D.C. Code § 24–442 (1987 Supp.), the District of Columbia Department of Corrections is "responsible for the safekeeping, care, protection, instruction, and discipline" of inmates housed at Lorton. As we see it, the statute implicitly recognizes a duty of reasonable care under the circumstances, the same common law standard we generally apply in all contexts of alleged negligence. *E.g., Scoggins,* 419 A.2d at 1005 (landlord and tenant); *Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C.1979) (professional negligence); *D.C. Transit System, Inc. v. Carney,* 254 A.2d 402, 403 (D.C. 1969) (bus accident). We see nothing in the statute—certainly no specifics—that could give rise to a claim of negligence *per se, cf. Scoggins,* 419 A.2d at 1003 n. 5 (housing code violations), let alone to a claim that the entire responsibility for an injury falls on the District absent an inmate's wilfull, wanton, or reckless conduct. *Cf. Martin v. George Hyman Construction Co.,* 395 A.2d 63 (D.C.1978) (industrial safety regulatory scheme). Consequently, there is no theoretical bar to the District's contentions that, on the facts alleged, the District was not negligent and, in any event, Mitchell had assumed the risk and/or was contributorily negligent.

C.

■ As to the District's first focus—Mitchell's leaning over the desk, knowing the ventilator cover above was dangerous—we see no basis for either instruction. Mitchell's lot as a prison dormitory inmate was analogous to that of a tenant who has "no reasonable alternative to remaining on the premises," *Scoggins,* 419 A.2d at 1004, or to a passenger on a common carrier who is "confined and cannot avail [himself] of normal opportunities for self-protection." *Wilson v. City of Kotzebue,* 627 P.2d 623,

628 (Alaska 1981). As the District's counsel himself observed, Mitchell was in a "trapped situation."

Accordingly, because Mitchell's confinement in the dormitory was not voluntary, he could not be said to have voluntarily assumed a risk that the ventilation cover would fall on him. *See Scoggins*, 419 A.2d at 1004. Nor could a juror reasonably conclude that Mitchell's conduct in leaning over a desk and talking to another inmate was unreasonable, and thus contributorily negligent, simply because the desk was located under a ventilation cover Mitchell knew was loose. Mitchell's actions must be viewed in the context of his "trapped situation." Although he lived in a large dormitory room, so did 45 others; freedom of movement was limited. Moreover, the residents were obliged to live and function with the configuration of beds, desks, and other furnishings that the prison authorities designed and enforced. There is no record evidence that Mitchell had anything to do with the location of the desk, or that he could have moved it to a safer place, or that the prison authorities expected inmates not to use the facilities provided there. Finally, there is no evidence that a ventilation cover had ever fallen before Mitchell's accident. Not unreasonably, therefore, as Mitchell testified, "you get lax ... you don't expect it to fall on you."

In sum, the inmates must accommodate themselves to the physical constraints which the prison authorities place upon them. Because prison dormitory residents have no choice in arranging their environment, it is reasonable for them to occupy the limited spaces to which they are confined and to use the facilities provided. Thus, while Mitchell's sitting at the desk under the loose ventilation cover may have been unreasonable when viewed in isolation, it was reasonable when viewed as part of a way of life dictated by the authorities in the special context of a prison dormitory. This conclusion is not novel; it is akin to our ruling that a tenant may live normally in premises plagued by housing code violations without being held accountable for contributory negligence (or assumption of risk) if those code violations

cause injury. *Scoggins*, 419 A.2d at 1005–06; *accord, Dollard v. Roberts*, 130 N.Y. 269, 29 N.E. 104 (1891) (tenant's child not contributorily negligent for walking through common hallway under ceiling she knew to be defective since it was only means of access to her apartment).

We do not hold that any action by a prisoner is *per se* reasonable. We have said on another occasion that when a party having a duty of reasonable care negligently causes injury, he or she may defend on the ground of contributory negligence if there is evidence tending to show that the other party, "by act or omission, unreasonably increased the exposure he or she otherwise would have had to danger created" by the first party. *Scoggins*, 419 A.2d at 1005. This reasoning might apply, for example, had Mitchell placed "shoots" up in the ceiling vents or in any other way actively contributed to the precarious condition of the vent covers. The record, however, shows no evidence that Mitchell actively created or aggravated that danger.

### D.

The District, however, presented a second reason for a defense instruction based on an "omission" that "unreasonably increased" Mitchell's risk of injury: his alleged failure to report the loose ventilation cover. Although the District characterized this alleged failure both as an assumption of risk and as contributory negligence, we have already explained that the defense, if any, is properly one for contributory negligence.

### (1)

Again, we note the context, beginning with the District's duty. Prison authorities have a statutory responsibility to exercise reasonable care in assuring safe conditions in prison dormitories. *Supra,* Part III. B. "What is reasonable depends upon the dangerousness of the activity involved. The greater the danger, the greater the care which must be exercised." *Carney,* 254 A.2d at 403 (citation omitted).

One of the potentially dangerous conditions that the Lorton prison manage-

ment regularly must address is the inmates' continuing efforts to obtain contraband and to hide it in their dormitories. Knowing this, management conducts regular "shakedowns." Officer Cook testified that, as part of the regular shakedown procedure, prison inspectors remove the ventilation covers—indeed, "any place where a vent could be removed"—to look for contraband, especially "shoots" (home made wine). The prison administration is on notice by its own experience, therefore, that inmates regularly unbolt and rebolt ventilation covers in the dormitories and that there is, accordingly, a continuing danger that these heavy ceiling covers will not be securely fastened. It follows that, in order to protect inmates against unreasonable risk of physical harm, the administration has a duty to inspect the ventilation covers often enough, and to secure the bolts with sufficient care, for a jury reasonably to conclude that those in charge have done "what is reasonable and prudent under the circumstances" to assure that the covers remain secure. *Wilson*, 627 P.2d at 628–29 (emphasis in original omitted). Otherwise, the District will be negligent. *See Pessagno v. Euclid Investment Co.*, 72 U.S.App.D.C. 141, 143, 112 F.2d 577, 579 (1940) (jury question whether, during snow storm, landlord exercised reasonable care in spreading sand four times during twelve hour period in driveway under its control where tenant's guest was injured); *Nubbe v. Hardy Continental Hotel System of Minnesota*, 225 Minn. 496, 499, 31 N.W.2d 332, 334 (1948) (landlord who retained control of stairway for common use of tenants had duty to exercise ordinary care, requiring "reasonable inspection from time to time," to prevent injury caused by deteriorating stairway).

Because this case concerns responsibility for discovering and correcting a dangerous condition when one party has ongoing control of premises occupied by another, our analysis of the District's duty draws initially on landlord and tenant law. For example, *Pessagno* and *Nubbe*, on which we rely, reflect the traditional rule that when a landlord retains control of a portion of the premises lawfully used by the tenant, such as control of a common room or hallway, the landlord will be liable "for physical harm caused by a dangerous condition . . . if the landlord by the exercise of reasonable care could have: (1) discovered the condition and the unreasonable risk involved therein; and (2) made the condition safe." RESTATEMENT (SECOND) OF PROPERTY (LANDLORD AND TENANT) § 17.3 (1977); *accord*, RESTATEMENT (SECOND) OF TORTS § 360 (1965); *see Levine v. Katz*, 132 U.S.App. D.C. 173, 174 n. 1, 407 F.2d 303, 304 n. 1 (1968) (citing *Pessagno, supra,* and RESTATEMENT (SECOND) OF TORTS § 360 (1965)). Thus, if a landlord, by the exercise of reasonable care, could have discovered a loose ventilation cover in a laundry room ceiling, then the landlord, by definition, would have had constructive notice of that condition and could be held liable for an injury caused by a negligent failure to make that condition safe. On the other hand, if the landlord could not have discovered the unsafe vent cover while exercising reasonable care—if, for example, the evidence showed a third party had loosened the cover between reasonably frequent inspections by the landlord—then the landlord would not have constructive notice of the reasonable risk involved and, absent actual notice, could not be found negligent in failing to keep the condition safe.[5]

In practical terms, this analysis provides a framework for the present case. We note, first, that whether or not prison shakedowns are conducted frequently and carefully enough to be reasonable under the circumstances—*i.e.*, whether management is careful or negligent—the inspectors may not discover a loose ventilation cover before it falls; that will depend on the timing of the shakedowns in relation to the cause of the loose bolts. Of course, the more frequent the shakedowns, the more likely it is the inspectors will detect and tighten a loose cover; but there will always be some period of dormitory life, however short, which even the most vigilant prison

---

5. This analysis, of course, does not address landlord liability for breach of the warranty of habitability. *See George Washington University v. Weintraub,* 458 A.2d 43 (D.C.1983).

management cannot reasonably be expected to protect. It follows that, when prison officials do carry out reasonably frequent and careful shakedowns but do not discover a loose ventilation cover (and are not otherwise aware of it), the District will not be liable for negligence if a cover falls causing injury—provided, of course, that the evidence shows the inspectors had left the cover tightly bolted after the last shakedown. On the other hand, if the inspections are conducted too infrequently or otherwise too carelessly to be reasonable under the circumstances, the District will be subject to liability for negligence because the inspectors presumably could have discovered the loose ventilation cover in the exercise of reasonable care.[6]

Given, therefore, that not even the most careful shakedown policy will keep ventilation covers tightly bolted all the time (since inmates frequently remove the bolts), we turn to the question whether an inmate's failure to report a loose ventilation cover has a bearing on the District's potential liability. There are two principal possibilities, depending on whether the prison authorities have, or have not, exercised reasonable care as to shakedowns.

■ First, assume that a ventilation cover fell, causing injury, between reasonably spaced and properly conducted shakedowns. Prison inspectors, therefore, could not have discovered the danger in the exercise of reasonable care, and thus the District cannot be held liable for negligent failure to discover and tighten the loose cover. If, however, between these shakedowns an inmate had told the prison authorities about a loose ventilation cover, that notification would trigger potential prison liability if the authorities did not respond before it fell; such notice would have been tantamount to a landlord's discovery of a hazard which the landlord has a duty to repair. Prison management, then, like a landlord in control of a common area, can be held liable for an injury caused by

failure to repair after actual notice of a defect, even though management otherwise would have escaped liability because it could not have discovered the danger in the exercise of reasonable care. *Compare* RESTATEMENT (SECOND) OF PROPERTY (LANDLORD AND TENANT) § 5.5(2) (1977), *with id.* § 17(3). In a case of liability triggered by actual notice, however, management's liability for negligence, as in the landlord and tenant situation, could not arise until management not only had received notice of the defect but also had had "a 'reasonable time' within which to make repairs." *George Washington University v. Weintraub,* 458 A.2d 43, 50, 51 (D.C.1983) (Ferren, J., dissenting); *accord,* RESTATEMENT (SECOND) OF PROPERTY (LANDLORD AND TENANT) § 5.5(4) (1977) (after tenant's entry, landlord's liability for negligent failure to keep leased property in repair is conditioned on request by tenant plus reasonable time within which to correct defect).

In sum, when prison authorities do exercise reasonable care in designing and implementing shakedown procedures, the only legal relevance of an inmate's failure to report a loose ventilation cover would be a lost opportunity to trigger prison liability for failure to correct a dangerous condition that the inspectors, absent actual notice, could not have discovered in the exercise of reasonable care. In these circumstances, the only way the prison could be negligent would be if an inmate were to report the danger and the authorities failed to act; otherwise, the prison could not be negligent whether or not an inmate reports the danger. Thus, for example, unless someone provided actual notice, the District would not be subject to liability if an inmate, such as Woody, created a situation with his "shoots" which the prison management, exercising reasonable care through periodic shakedowns, could not have been expected to detect and rectify before a particular injury occurred. The only issue of contributory negligence in this context, therefore, would arise if an inmate were to

---

6. We say "presumably" as a way of indicating that there is room for prison authorities to argue the lack of proximate cause by attempting to show that, even if the shakedown policy was negligent, prison inspectors could not have discovered a particular hazard in the exercise of reasonable care.

report a hazard in the dormitory (such as Woody's actions), triggering potential prison liability, but then were to act carelessly with respect to the hazard before management corrected it. *See supra*, Part III. C.

We turn now to the other situation: the prison authorities do not exercise reasonable care. Assume that an injury caused by a falling ventilation cover occurs between unreasonably spaced or otherwise careless shakedowns and that prison inspectors could have discovered and corrected the danger in the exercise of reasonable care. Under these circumstances the District is negligent. Thus, the question, when the prison's shakedown procedures are negligent, is whether an inmate's failure to report a heavy ceiling vent cover he knew was loose can amount to contributory negligence.

Contributory negligence will be a defense if a tenant, for example, knowing of a danger, unreasonably uses the premises. *Compare Scoggins*, 419 A.2d at 1005, *with Dollard*, 130 N.Y. at 273–74, 29 N.E. at 105; *see* RESTATEMENT (SECOND) OF PROPERTY (LANDLORD AND TENANT) § 17.3, Comment f., and Reporter's Note, item 10. Thus, continuing with our real property law analogy, it is instructive to inquire whether a tenant's failure to report a hazard in a common area controlled by the landlord can, in itself, amount to an unreasonable use of the premises. Consider the landlord who could have discovered the loose ventilation cover in the laundry room by the exercise of reasonable care. By definition, the landlord would have had constructive notice of the danger because, by the exercise of reasonable care, he or she would have had actual notice. If the tenant had told the landlord about it, therefore, that notification would have been legally redundant; the landlord would be deemed to have known about the danger anyway since it was discoverable in the exercise of reasonable care.

■ More specifically, when a landlord is in control of a portion of the premises, the tenant's own duty of care does not extend to assuming the very duty—discovery of hazards in that area—assigned by law to the landlord. Accordingly, if a tenant were to be found contributorily negligent for failing to report a hazard in a common area, that breach of duty would have to be premised on the tenant's fortuitously knowing about the danger; absent a tenant's actual knowledge of a situation the tenant did not have a duty to discover, the negligent landlord would be liable. As a practical matter, however, a danger discoverable by a landlord in the exercise of reasonable care will often be evident to a tenant as well. As a result, if a contributory negligence defense for failure to report known dangers were to be available as a general rule, then in many instances a tenant's failure to report a hazard would give the negligent landlord a complete defense, even when a landlord has control of the premises; effective responsibility for damages in the common area would thus be significantly shifted from the landlord to the tenant. Indeed, the distinction between a rule dictating landlord liability for an injury in a common area when a tenant is unaware of the danger, and a rule precluding landlord liability when a tenant knows of the danger but fails to report it, could become largely theoretical; the latter might tend to swallow the former.[7]

■ In sum, if a tenant with alleged knowledge of a hazard could be held contributorily negligent simply for failing to tell a negligent landlord what the landlord, in the exercise of reasonable care, could have known on its own, then the traditional rule imposing liability on landlords, based on constructive notice, would in many cases for all practical purposes be repealed.[8]

---

7. Furthermore, if the liability of a landlord with constructive notice of a hazard were contingent, nonetheless, on actual notice from a tenant who personally knew about it, then the landlord presumably would be entitled not only to notice but also to a reasonable period thereafter within which to make repairs. Thus, the contributory negligence defense could be invoked not only when a tenant failed to report a hazard but also when the tenant did report it but failed to do so soon enough to afford the landlord an opportunity to prevent the injury.

8. Indeed, the nonreporting tenant may well have assumed that the landlord has made rea-

The law applicable to landlords who control a portion of the premises would become the same as the law applicable to landlords when the tenant has assumed exclusive possession of the premises: the landlord would be liable only on receiving actual notice from the tenant and a reasonable period within which to make repairs. As applied to the present context, this would mean that even when prison management has constructive notice of a hazard and does nothing about it, the District could not be liable if an injured inmate, who happened to know about the hazard, had failed both to report it and to avoid injury while management had a reasonable time for making repairs. This court is not prepared to go that far. If we were to permit a defense of contributory negligence based solely on a failure to report a hazard which management had the responsibility to discover, we would provide an incentive for prison management to relax its standards for assuring the safety it has a statutory responsibility to maintain. We would thus risk shifting to the inmates themselves a central, legal responsibility for assuring the reasonable care required to protect their lives in the dormitory. District of Columbia law places that responsibility on public officials.

Channels, of course, are available to prisoners for reporting hazards that do occur, and apparently, on occasion, these channels are used. But, as a general proposition, an inmate's failure to report a hazard should have only one consequence: a failure to trigger prison liability for injuries that occur when, in the exercise of reasonable care, the management could not have discovered the hazard and thus did not have a

reasonable opportunity to eliminate it. We therefore conclude, as a general rule, that a prisoner cannot be found contributorily negligent simply because he or she fails to report a dangerous condition which prison management, through its control of the premises, could have reasonably been expected to discover through regular shakedown and maintenance procedures. In short, an inmate normally can assume that prison officials are doing their job.

(2)

This general rule is premised on an assumption that both the prison management and the injured inmate have sufficient notice of the danger (whether actual or constructive) that an inmate may assume a report to management would be redundant. There is, however, an exception that applies when an inmate who knows of the danger has reason to believe the prison authorities in fact do not know about it. In such a case, constructive notice is exposed as a fiction; an inmate has reason to know that actual notice will be necessary, despite the authorities' presumed awareness based on a responsibility to stay on top of the situation. Under such circumstances, we conclude that the inmate—if not otherwise constrained [9]—has a duty to report the danger; otherwise, that inmate cannot personally recover (because of the absolute bar of contributory negligence) for injuries that his own actions might have prevented. We illustrate this exception by reference to the law applicable to common carriers, which is frequently invoked in defining a jailer's duty to prisoners because both passengers and prisoners are subject to the control of others and thus normally are not in a position to protect themselves. *E.g.,*

---

sonable inspections and thus is already aware of the needed maintenance or repairs.

**9.** In this case there is no evidence that inmates were afraid to report a hazard; Mitchell's evidence was to the contrary. But, in some instances, an inmate may have good reason to fear the consequences of reporting a dangerous condition if it was created or exacerbated by a fellow inmate. Such reporting may invite pressure from the authorities to reveal the name of the perpetrator and, in any event, may invite reprisals from one or more other inmates who are found, or deemed, responsible. Under such

circumstances, a court would be hard pressed to say an inmate failed to exercise reasonable care, and thus was contributorily negligent, because he or she was unwilling to incur what may have reasonably been perceived as a greater risk from informing on other inmates. *See Doe v. City of Albuquerque,* 96 N.M. 433, 437, 631 P.2d 728, 732 (1981) (court did not err in refusing to give contributory negligence instruction as to inmate's failure to call for a guard before cellmates broke his jaw, since cellmates threatened slitting his throat and beating him all night long if he did so).

*Wilson, supra;* RESTATEMENT (SECOND) OF TORTS § 314A (1) & (4).

Occasionally, there is a question whether a passenger was contributorily negligent in failing to warn the driver about an imminent peril.

> A duty to warn may arise where the passenger observes a peril, but that duty does not arise simply because the passenger observes the ordinary hazards which are equally observable by the driver. The duty arises when circumstances indicate to the passenger that the driver has not in fact noticed the hazard.

*Lehman v. Anderson,* 27 N.J.Super. 444, 447, 99 A.2d 517, 518, (1953), *aff'd,* 14 N.J. 340, 102 A.2d 385 (1954); *accord, Brooks v. Sun Cab Co.,* 208 Md. 236, 243–44, 117 A.2d 554, 558 (1955); *Ploesser v. Burlington Rapid Transit Co.,* 121 Vt. 133, 142, 149 A.2d 728, 733 (1959). Accordingly, the defense of contributory negligence for failure to warn the driver will not be available when, the exercise of reasonable care, the driver could have seen a particular hazard, *except* when "circumstances indicate" to the passenger that the driver does not in fact see the hazard. If the law of contributory negligence were not so limited, it would, in effect, shift to the passenger the driver's duty to be vigilant.

There may be situations in which prison management, in the exercise of reasonable care, could have known of a hazard that caused injury but in fact, because of negligence, did not know about it, and yet the injured inmate not only kenw about the hazard but also had reason to believe that management knew nothing about it. Under such circumstances, where an inmate arguably could have prevented his or her own injury by giving notice, there may be room for a contributory negligence instruction. *But see supra,* note 9. In the present case, therefore, we must consider whether there is record evidence from which a jury reasonably could have concluded that circumstances known to Mitchell indicated prison management did not know the ventilation cover that eventually fell on him was loose and dangerous.

(3)

Mitchell and Elder testified that they had reported the loose cover to management through Officer Cook, Lieutenant Haywood, and Mr. Krause, and that maintenance men had replaced the cover "near the end of June" with only two screws. Officer Cook testified, however, that the last shakedown had occurred "approximately a month" before Mitchell's July 2 accident; that Cook, as squad leader, called in 90% of the inmates' complaints to management; that neither Mitchell nor Elder had spoken with him about the loose cover until two weeks after the accident; and that Mitchell, at the time, had blamed Woody, a fellow inmate, for the loose ventilation cover. Haywood and Krause did not testify. A jury, therefore, reasonably could infer from Cook's testimony (and from the absence of any testimony by Haywood and Krause corroborating Elder) that Mitchell, Elder, and presumably the other inmates not only had failed to report the hazard through the usual channel, Cook, but also had been aware that management probably did not know about it because the last shakedown had taken place a month before the accident, well before Woody had unbolted the cover to store his "shoots" in the dormitory ventilation system.

The District, therefore, would have been entitled, upon request, to an instruction that the jury could find Mitchell contributorily negligent if it found (1) that he knew about the loose ventilation cover, (2) that he had failed to inform the prison authorities about that danger, and (3) that he had reason to believe the authorities did not know about it, even though they were likely to have discovered it had they exercised reasonable care.

A problem, however, remains. In requesting a contributory negligence instruction on failure to report the loose ventilation cover, the District's counsel premised that request to the trial court—and to this court—on an instruction that would contain only the first two elements outlined above. That proposed instruction would have violated the general rule precluding a finding of contributory negligence based merely on

a failure to report a known danger when the party responsible for making the condition safe has constructive notice of it. There was no proffer or discussion at trial —nor is there on appeal—calling for a narrower instruction incorporating the third element that invokes the exception. Accordingly, the trial court was not afforded an opportunity to consider the case from the only perspective that would have lent substance to the District's concern; counsel for the District asked only for an instruction which, under the general rule, the trial court was duty-bound to deny.

Under such circumstances, we cannot discern trial court error and thus, as explained in Part II. B., we may reverse only if it is apparent from the record that a "miscarriage of justice" has occurred. *Ceco Corp.*, 441 A.2d at 947; *Mark Keshishian & Sons, Inc. v. Washington Square, Inc.*, 414 A.2d 834, 839–40 (D.C.1980); *Weisman*, 390 A.2d at 999–1000; *W.W. Chambers, Inc. v. Audette*, 385 A.2d 10, 15–16 (D.C.1978); *see* Super.Ct.Civ.R. 51 (party may not assign as error the failure to give an instruction unless the party objects, stating distinctly the grounds of objection).

■ On this record the trial court's failure to instruct on contributory negligence

does not appear prejudicial, let alone a miscarriage of justice. It is true that counsel for Mitchell and for the District in closing argument, as well as the trial court in its instructions, told the jury that Mitchell had to show the District either "knew or should have known" of the dangerous ventilation cover in time to have corrected it; and the court explicitly acknowledged that Mitchell did not have to show actual notice. Thus, the jury was informed that Mitchell had the burden of demonstrating either actual or constructive notice.[10] But the issue was joined, fundamentally, on the question whether the District had actual, not constructive, notice. Mitchell's witnesses said yes, the District's said no. That issue (as well as damages) comprised the central thrust of the closing argument for both sides.

Counsel for Mitchell stressed the evidence tending to prove that Mitchell and Elder had reported the loose cover, that District inspectors had climbed into the ventilation system in "May or June," that "June is only two days before the ventilation cover fell on Mr. Mitchell," and that even if Officer Cook was correct in testifying that Mitchell had said Woody had put the shoots up there, prison officials were

---

**10.** Specifically, the court instructed:

The District has not violated its duty to the plaintiff unless it is shown that the condition is dangerous and that either the District had actual notice or knowledge of the condition in time to have corrected the condition, or that it be shown that the condition has remained for such a period of time that the District ought to have known of it in time to correct the condition. It is not necessary to find from the evidence that the defendant had actual notice of the condition. If the condition from its character, notoriety or continuance ought to have been known to the defendant, then notice of the condition shall be imparted to the District of Columbia, that is presumed.

If the condition or defect is a large one or otherwise conspicuous, the authority should have known of it sooner than with a small defect or inconspicuous condition. No certain duration of time is required in order to impart notice. But the law does not require impossibilities of any person, natural or artificial, corporate or individuals, cities, municipalities or whatever. And it is impossible that all parts of a correctional institution should be under constant inspection. Every such case must be de-

cided and determined on its own peculiar circumstances.

In order for the plaintiff to recover on the first count, that's the falling grate, the evidence must establish by a preponderance four things. One, that there was a dangerous condition on the premises; two, that Bobby Lee Mitchell was injured; three, that Bobby Lee Mitchell's injury was a proximate result of the dangerous condition; and four, that the District of Columbia knew or should have known of the condition in time to have corrected it.

Now, if you find each of these elements is established by a preponderance of the evidence, you should find for the plaintiff, Bobby Lee Mitchell, on this count and proceed to award him damages, as I will later instruct you. I'll give you a jury verdict form. On the other hand, if you find there was no dangerous condition or there was a dangerous condition but the District of Columbia did not know and under the circumstances should not have known, or if you find that Bobby Lee Mitchell was not injured as a result of the dangerous condition, then, of course, your verdict should be for the District of Columbia. Under those circumstances, you don't worry about damages.

the ones who had "unscrewed the ventilation cover ... and left it loose." Mitchell's counsel never pointed out to the jury that Mitchell could win even if Mitchell or his witnesses had not reported the loose cover or if the prison authorities had not otherwise received actual notice. Indeed, in his closing rebuttal argument, Mitchell's counsel, in effect, told the jury to premise its verdict on the District's actual notice of the loose cover, as evidenced either by Mitchell's and Elder's reports *or* simply by the fact that prison inspectors had removed the cover, and thus must have been aware of its condition, "shortly before it fell" on Mitchell:

> And counsel says the Judge is going to tell you about actual and constructive notice of the ceiling grate. They are the ones that were up there, whether they were up there as a result of Mr. Elder and Mr. Mitchell saying this ventilation system isn't working, please do something. Because we know, and it's undisputed, ladies and gentlemen, that they took the ventilation grate down shortly before it fell on Mr. Mitchell, not for an inspection but to wash it out in the tubs. Mr. Elder said that, Mr. Mitchell said that. And no correctional officer said, hey, we never went up there, *so we are not talking about constructive notice that it had to be a long time.* They are the ones that are up there taking the ventilation cover down. And if they are taking it down because other inmates are putting shoots up there, then maybe they ought to do something about locking the barn door. [Emphasis added.]

Focusing on the same issue, counsel for the District argued, referring to documentary evidence, that there was no report showing an inmate had told prison authorities about the vent cover, as alleged, and thus that Officer Cook's testimony, not Mitchell's, should be believed. Counsel for the District also alluded to testimony that prison "officials had gone up into the ventilation cover looking for shoots" but then merely had asked the jury to "think back, is there any testimony relating to how long the screws were supposed to have been loose?"

In sum, as the case was tried and argued to the jury, we believe it is most unlikely that the jury found for Mitchell on a constructive notice theory. Because the jury apparently either found no failure to report or otherwise found actual notice of a defectively bolted cover, by virtue of the inspectors' presence on the scene a few days before Mitchell's injury, the trial court's decision not to instruct as to contributory negligence could not have been seriously prejudicial. *See Capitol Hill Hospital v. Jones,* 532 A.2d 89, 94 n. 17 (D.C.1987). There was no miscarriage of justice.

### IV.

Mitchell contends on cross-appeal that the trial court erred in granting a judgment n.o.v. on count II—the District's alleged failure to provide proper treatment following his surgery in May 1980 for a ruptured hernia.

### A.

At trial, the court instructed the jury that count II was not a medical malpractice claim. Instead, the court instructed the jury on the issue of ordinary negligence— the failure to provide adequate and necessary medical treatment—without reference to any need for expert testimony to establish the standard of care.

The court had concluded at the end of the plaintiff's case that Mitchell had not established malpractice, *i.e.,* as the court put it, "injuries resulting from a deviation from an established standard" of care based on expert testimony. But the court allowed Mitchell to amend the pleadings to allege ordinary negligence, premising its decision on the assumption that

> the evidence [at trial] established that the injury was of such a nature that it was readily apparent to any layperson that medical attention was required and therefore [the court] determined that the only remaining issue for the jury to decide was whether the failure to get the needed attention was as a result of the Plaintiff's refusal or the Defendant's failure to provide it.

In its order granting the judgment n.o.v. on count II, however, the court recognized that count II necessarily was a medical malpractice claim and thus properly concluded that count II should not have gone to the jury under an instruction that did not recognize the need for an expert to establish the standard of care.[11] Moreover, the trial court granted a judgment n.o.v. instead of a new trial because the court concluded that Dr. Robb's expert testimony had not established the required standard of care.

Mitchell's malpractice claim, therefore, presents the question of the proper standard of care for post-operative treatment of an open, draining wound of a prison inmate. In granting the judgment n.o.v., the court found no evidence that the Lorton Reformatory or its infirmary had deviated from an established standard of care in failing to provide additional treatment. According to the court, "[a]lthough Plaintiff's expert [Dr. Robb] testified without objection that the District of Columbia failed to meet the appropriate standard, he was obviously referring to D.C. General Hospital's physicians because he had not otherwise qualified nor had he purported to know the appropriate standard for a penal institution or its infirmary." In other words, the court concluded that expert testimony was necessary, but that Dr. Robb's testimony did not suffice because he could not testify about the "appropriate standard for a penal institution or its infirmary."

The court's order suggests two questions: (1) Does the malpractice standard of care for a penal institution differ from the standard required of physicians in private or other institutional settings? (2) If there is no difference between the standards, did Dr. Robb's testimony establish a standard of care and a breach of that standard?

### B.

■ We disagree with the court's premise that physicians who serve a prison population may be held to a standard of care different from the one imposed on physicians in other contexts. We conclude that physicians owe the same standard of care to prisoners as physicians owe to private patients generally. "The fact that negligence and malpractice are alleged to have taken place in a jail makes no difference." *Fischer v. City of Elmira*, 75 Misc.2d 510, 513, 347 N.Y.S.2d 770, 774 (1973) (citing *Pisacano v. State of New York*, 8 A.D.2d 335, 188 N.Y.S.2d 35 (1959)). *See Bowers v. County of Essex*, 118 Misc.2d 943, 945, 461 N.Y.S.2d 959, 961 (1983); *Hight v. State*, 35 Misc.2d 926, 231 N.Y.S.2d 361 (1962); *Shea v. City of Spokane*, 17 Wash. App. 236, 246, 562 P.2d 264, 270 (1977), *aff'd and adopted* 90 Wash.2d 43, 578 P.2d 42 (1978) (en banc).

In *Shea*, the Washington Court of Appeals, and later the Supreme Court of Washington, were faced with a situation similar to Mitchell's; medical experts were questioned as to what an average, competent doctor would have done under conditions similar to those in the instant case. The defendant in *Shea* argued that the plaintiff had failed to establish an appropriate standard of care for a jail physician. The court explained: "The standard of care in medical malpractice cases is that degree of care expected of the average competent practitioner in the class to which he [or she] belongs, acting in the same or similar circumstances.... Here, the jail physician, a general practitioner, is required to exercise the same standard of care of the average, competent doctor." *Shea*, 17 Wash.App. at 246, 562 P.2d at 270. We agree that "[p]rison physicians owe no less duty to prisoners who must accept their care, than do private physicians to their patients who are free to choose." *Pisacano*, 8 A.D.2d at 340, 188 N.Y.S.2d at 40. Indeed, in this case the doctors responsible for Mitchell's follow-up care were functioning out of D.C. General Hospital where private patients are attended. The fact that Mitchell was a prisoner provides no excuse for these physicians to treat him differently from other patients.

---

11. In *Estelle v. Gamble*, 429 U.S. 97, 105–06, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976), the Supreme Court ruled that an inmate complaining about medical care either has a constitutional claim or a medical malpractice claim. Mitchell has not raised a constitutional claim.

### C.

■ We also agree with Mitchell that Dr. Robb's expert testimony established a standard of care and a breach of that standard. Dr. Robb testified that he had examined Mitchell's records and that it was "appropriate" for treating physicians to watch the infection site for several months to see if the stitches were being "completely absorbed." After the first few months, however, the physicians gave Mitchell antibiotics and told him to use hot compresses; more definitive care was not provided.

After a hypothetical presentation of the facts surrounding Mitchell's surgery and follow-up care, Dr. Robb was asked if he had "an opinion based upon reasonable medical certainty as to whether or not the defendant, District of Columbia, used that degree of care and skill which is expected of a reasonably competent institution in the same or similar circumstances?" Dr. Robb replied, "I believe the level of care was below the competence that could be expected in a situation like this." He explained that Mitchell's condition had "gone on for four years without definitive care other than just taking care of things on the day that he comes on sick call and giving him some antibiotics and telling him to use hot compresses, hot soaks, [and this treatment] is below the level of care that could be expected."

Q. [I]s the failure to treat this open area, this fistula this open sore for four years, is that what you were saying was below the level of care?

A. Well, they did treat him, but they did not become aggressive enough after a certain period of time as far as considering exploratory surgery to find out a reason for it.

Dr. Robb acknowledged, and Mitchell admitted, that Mitchell had refused more aggressive treatment on several occasions. Mitchell added that he had refused such treatment because, on the proposed dates, he had various hearings and visits scheduled that conflicted with the treatment.

Dr. Gregory Johnson testified for the District. He explained that he had examined Mitchell in May 1984 and scheduled him for surgery to remove a stitch granuloma. The surgery was not performed as scheduled.

In reviewing the grant of a judgment n.o.v., we must determine whether, as a matter of law, the party who obtained the verdict presented sufficient evidence for the jury to consider under the theory of the case. We must "view the evidence and all reasonable inferences in the light most favorable to the party who obtained the jury verdict" and affirm "only if no juror could reasonably reach a verdict for the opponent of the motion." *District of Columbia v. Cassidy*, 465 A.2d 395, 397–98 (D.C.1983) (per curiam) (quoting *Marcel Hair Goods Corp. v. National Savings & Trust Co.*, 410 A.2d 1, 5 (D.C.1979)).

Focusing on this standard, and on Dr. Robb's testimony, the District contends the evidence was similar to the evidence we held insufficient in *Meek v. Shepard*, 484 A.2d 579 (D.C.1984). We do not agree. In *Meek*, the expert witness "never testified as to the standard of care, but rather stated only what he would do under similar circumstances." *Id.* at 581. Mitchell's case is different. Dr. Robb did not discuss how he would have treated the patient. His testimony presented a standard of care and a breach of that standard. Accordingly, we conclude that Mitchell was entitled to go to the jury on his malpractice claim.

### D.

■ Mitchell, however, is not entitled to reinstatement of the verdict, for two reasons. First, we agree with the trial court that count II was a malpractice claim that required expert testimony to establish the standard of care. *Meek*, 484 A.2d at 581 & n. 4. The standard for post-operative treatment is not readily discernible by a layperson. *See id.* (and cases cited). Second, although Mitchell met this requirement, the trial court believed at the time that it could submit the case to the jury on an ordinary negligence theory, without need for expert testimony to establish the standard of care; thus, the jury reached a verdict for Mitchell on instructions that arguably made his case easier than it

should have been for the jury to find in his favor. Accordingly, as the District correctly points out, the best Mitchell could hope for on appeal is a reversal and remand for a new trial on count II under proper instructions.

### V.

The District also asserts the trial court abused its discretion when it refused to grant the District's request to instruct the jury that the correctional officers to whom Mitchell's counsel referred in his "missing witness" rebuttal argument on count III were equally available to both parties.

### A.

Mitchell testified he had not seen any correctional officer (guard) in the area for ten to fifteen minutes before the assault. Nor had he seen any guard during the time Moore was beating him, although he admitted he could not see whether there were guards in the guard house overlooking the area. Mitchell further testified that fifteen minutes after his beating, two correctional officers, Lieutenant Golden and Officer Estep, arrived. Mitchell told them he had fallen in an open manhole, for he feared he would be placed in maximum security for his safety if he told them the truth. Once in the ambulance, however, Mitchell told one of the medical technical assistants (MTAs), Joe Hagnagy, that Moore had broken his leg with a pipe, and, at the hospital, he told Sergeant Williams about Moore's assault. Mitchell also claimed he had told Officer Hamm, Sergeant Burchett, and Sergeant Becker some time later that he had been assaulted with a lead pipe.

Two other inmates, Robert Burrell and Thomas Elder, testified for Mitchell. Burrell, who had been with Mitchell and witnessed the assault, testified that he had seen no guard in the area at the time or immediately thereafter. Elder testified that he had arrived immediately after the assault and had seen no guard in the area.

Officer Michael J. Estep testified for the District that he and three other correctional officers had responded to the scene. He said that he had heard Mitchell say he had fallen down. "If he had said he was as-saulted, I would have written up a report." Estep also testified about shakedown procedures and security at the Central Facility, as did Major David P. Decatur and Lieutenant Eugene A. Dickinson. Finally, Sergeant Bailey Becker testified for the District that Mitchell never had told him about the assault.

### B.

In rebuttal of the District's closing argument, counsel for Mitchell reminded the jury that the District did not call any correctional officer to testify that he or she had seen the assault on Mitchell; Counsel noted that the officers who did testify admitted they were not in the area at that time. Counsel indicated, further, that the District did not call to the stand four of the five correctional officers whom Mitchell testified he had told about the assault.

Counsel for Mitchell told the jury he was making these arguments in response to a rhetorical question the District's counsel had asked the jury during closing argument: "Where is the pipe?" Counsel asserts in his brief that he also was "clearly rebutting the District's argument that just because two or three people did not see officers in the area where Mr. Mitchell was assaulted it didn't mean there weren't officers in the area."

After Mitchell's closing argument, the District asked the court to give a cautionary instruction:

Your honor, in light of closing argument, could we ask the Court to give a short instruction on the fact that the witnesses named in rebuttal were equally available. It's not a missing witness rule because they were equally available to both parties, and [Mitchell] could have just as equally called them to corroborate [his] testimony as the [District] to rebut it. And I think that we are entitled to that kind of instruction because the impression was left that this is somebody—these are people who are only within our control and they weren't.

The court denied the request.

### C.

In a recent case, *Stager v. Schneider*, 494 A.2d 1307, 1312–14 (D.C.1985), we had

occasion to review the law relating to missing witness instructions in civil cases. We noted that the instruction may be given when premised on the following situation: " '[I]f a party has it peculiarly within his [or her] power to produce witnesses whose testimony would elucidate the transaction, the fact that he [or she] does not do it creates the presumption that the testimony, if produced, would be unfavorable.' " 494 A.2d at 1313 (quoting *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893)). "To be peculiarly available, a witness: (1) must be within a party's particular ability to locate and produce and (2) must have such a legal or factual status with respect to the party as to make it natural to expect that party to have called the witness." *Id.* (citing *Thomas v. United States*, 447 A.2d 52, 57 (D.C.1982)). In order to meet the test for elucidating the transaction, the "testimony must be both material and relevant to a disputed issue, ... must be noncumulative, ... and must constitute an important part of the case of the party against whom the inference is drawn." *Id.* (citations omitted). Also, we stated that a party intending to argue a missing witness inference is "required to seek and obtain a prior ruling from the court; the court must state its finding[s] which underpin its ruling." *Id.*

### D.

Counsel for Mitchell did not obtain prior approval from the court. Nor did counsel for the District object to counsel's argument. Instead, the District's counsel later requested an instruction that the witnesses to whom counsel referred in rebuttal argument were equally available to both sides.

We are dealing with two categories of missing witnesses: (1) officers, if any, who saw the assault, and (2) four of the five officers whom Mitchell testified he had told about the assault. The District argues that these witnesses would have been as relevant and material for corroborating Mitchell's case as they would have been for the District's; thus, although these witnesses could have elucidated the transaction, it would have been no more "natural" for the District to have called them than

for Mitchell to have done so. Furthermore, says the District, there is no basis for assuming these witnesses were "practically available" only to the District. *See Dent v. United States*, 404 A.2d 165, 170 (D.C. 1979). The District argues that Mitchell's counsel, in failing to seek court permission for the argument, did not provide the opportunity for a bench colloquy on whether various potential witnesses were still employed by the District and, if so, whether the employer-employee relationship, under the circumstances, implied a bias for the employer that would have made these witnesses peculiarly available to the District. *See Thomas*, 447 A.2d at 58 (citing *Milton v. United States*, 71 U.S.App.D.C. 394, 110 F.2d 556 (1940)).

■ We note, first, that the District had no legitimate basis for a neutralizing instruction with respect to the first category of missing witnesses: officers, if any, who had seen the assault. Mitchell had called three witnesses—Mitchell himself, Burrell, and Elder—who testified that they had not seen any guard in the area where Mitchell was assaulted. Thus, for Mitchell to have called various guards to testify as to whether they had been present would have been cumulative; the burden of production had shifted to the District. Furthermore, the District's counsel in closing argument had stressed: "There was no testimony that there were no guards there. There was only testimony that one or two witnesses at a particular point in time at a particular spot did not see any guards. That does not establish, ladies and gentlemen, that no guards were there." The District, therefore, came close to making a missing witness argument of its own. Thus, counsel's rebuttal argument that the District had called no one to testify that guards were in the area was not unfair.

■ Counsel's comment on the District's failure to call four of the five officers whom Mitchell testified he had told about the assault, however, is more troublesome. The District had called one of the five, Sergeant Becker, who had testified that Mitchell had not told him about the

assault. Accordingly, it would have been as "natural" for Mitchell to call the other four (Hamm, Williams, Burchett, Hagnagy) to corroborate his own testimony—and thus to isolate the witness the District did call—as it would have been for the District to call the other four to reinforce the impression that Mitchell had lied. The failure to call these witnesses does not permit an inference more favorable to one side than to the other.

■ We cannot say, however, that the trial court abused its discretion in denying the District's request. In the first place, the District did not object to counsel's argument; it could have joined issue before any real damage was done. Second, the District's proposed instruction did not distinguish between the two categories of missing witness references, only one of which justified the District's request. Third, the District itself, without court permission, had made both a missing evidence (the lead pipe) and a missing witness (officers on the scene) argument. Finally, the trial court had heard all the testimony and was in a position to decide whether counsel for Mitchell had created such prejudice that a neutralizing instruction was necessary. In sum, we perceive no reversible error here.

## VI.

The District contends in its protective cross-appeal on count II that the trial court erred when it refused to allow District medical employees, Dr. Seipel and Dr. Johnson, to testify about their personal knowledge of Mitchell's medical condition because they were not listed in the pretrial statement as expert witnesses pursuant to Super.Ct.Civ.R. 26(b)(4). In its appeal on counts I and III, the District makes an identical complaint about the court's alleged exclusion of testimony by the Administrator of Lorton's Central Facility, Salanda Whitfield, about "security and shakedowns."

Rule 26(b)(4) requires that a party who intends to rely on expert opinions must provide the opposing party with the substance of the expert's expected testimony before trial. The District asserts that Dr. Seipel, who treated Mitchell at Lorton Infirmary, and Dr. Johnson, who treated Mitchell at D.C. General Hospital, were not listed as experts on the District's pretrial statement because they were not being called as "experts." In *Adkins v. Morton*, 494 A.2d 652, 656 (D.C.1985) (quoting Super.Ct. Civ.R. 26(b)(4)—decided after the trial of this case—we held that Rule 26(b)(4) applies only to "facts and opinions 'acquired or developed in anticipation of litigation or for trial.'" The rule does not apply to professionals or practitioners who acquire information and develop opinions as "actor[s] or viewer[s]" in the course of treating the patient. *Id.* at 657. Although the trial court, therefore, may have erred when it excluded the physicians' testimony, any error is irrelevant since we have held that Mitchell is entitled to a new trial on count II, not to reinstatment of the verdict. *Adkins* is available to guide the parties and the court on retrial.

As to the alleged exclusion of Salanda Whitfield's testimony, the District's argument is misplaced. Counsel for the District told the trial court Whitfield would testify that there would have been an investigation if Mitchell had told prison officials he had been assaulted. In addition, Whitfield would explain policies and procedures at the institution. He would also testify about relevant prison jargon, about how he knew Mitchell, and about what he knew of the leg injury incident. The District also wanted Whitfield to testify that Mitchell was able to read, even though Mitchell had testified he could not read.

After questioning Whitfield, the court concluded that Whitfield could not say Mitchell was able to read. The court therefore prohibited the District from questioning Whitfield on this issue. After more discussion, including the court's question whether the District was trying to qualify Whitfield as an expert (to which counsel replied, "I'm not"), the court allowed the District to continue to question Whitfield.

Counsel for the District then questioned Whitfield about his knowledge of the assault and about what Whitfield would have

done if Mitchell had told him he had been assaulted. Corporation counsel did not ask Whitfield about security and shakedown procedures as such. Moreover, the court had allowed the District to question Mr. Cook, Officer Estep, Lieutenant Dickinson, and Major Decatur on security and shakedown procedures. In sum, Whitfield's testimony was not limited, as the District claims, by reference to Rule 26(b)(4).

## VII.

The District also argues that the trial court abused its discretion in refusing to grant the District's request for a continuance when Lieutenant Golden, a material witness for count III, became ill shortly before trial. The District proffered that Golden was the only corrections official who could testify about the location of various officers at the time Mitchell allegedly had been assaulted, and that he was one of the first officers to reach Mitchell after the incident. Mitchell's counsel offered to depose Golden at the hospital, but the District objected. The court then suggested that a stipulation of Golden's testimony be prepared in lieu of continuing the trial, but the District again objected. The court then learned from Golden's physician that Golden would be available for a deposition. The court denied the requested continuance because the court concluded, after the District's proffer, that Golden's testimony was not critical and that his credibility was not at issue. The next day, however, the District notified the court that Golden had had emergency surgery and no longer would be available for deposition. The District again requested a continuance, which the court denied.

A stipulation was prepared summarizing Golden's anticipated testimony. Counsel for Mitchell noted that a portion of the stipulation impeached Officer Estep, a witness for the District. Their testimony differed on the issue of which Officer had been the first to arrive at the scene. The District said that if Golden had testified, he would have been able to clarify the alleged inconsistency.

The District argues that Golden's testimony was material and that his credibility was at issue. The District bolsters this argument by noting that, during closing argument, Mitchell's counsel focused on the purported inconsistencies among Golden's incident report, the testimony of another corrections officer, and the testimony in the stipulation.[12]

We agree with the trial court that Golden was not a critical witness. As acknowledged by the District's counsel at trial, Golden would not have been able to pinpoint the locations of the officers who should have been in the area at the time of the assault. The District indicated that Golden only could have explained where the officers were supposed to have patroled. Moreover, the inconsistency between his testimony and Officer Estep's was not material. Both officers arrived at the scene after the assault had occurred. Who arrived first was not important; their testimony was consistent in all other respects. Both said that no inmates were on the scene and that Mitchell was just standing there holding a chair. Both said Mitchell told them he had fallen. Counsel for Mitchell mentioned the inconsistency between the two officers' testimony during his closing argument, but he argued, further, that it did not matter which officer had arrived first because neither one had been in the area at the time Mitchell was injured.

The decision to grant or deny a continuance is within the trial court's sound discretion and is not subject to reversal unless that discretion is exercised arbitrarily. *O'Conner v. United States,* 399 A.2d 21, 28 (D.C.1979); *Feaster v. Feaster,* 359 A.2d 272, 273 (D.C.1976). In the instant case, Lt. Golden was not a material witness, his testimony was presented in the form of a stipulation, and his credibility was not a

---

12. During closing argument counsel for Mitchell described the report Lt. Golden had prepared of the incident. He noted that Golden claimed he had found a resident standing up with blood running down his leg. "He says Officer Estep and MTA Hagnagy arrived in an ambulance. And, of course, Officer Estep said he was there first. They can't even get that together."

real issue. There was no abuse of trial court discretion.

## VIII.

Mitchell argues that D.C.Code § 28–3302(b) (1987 Supp.), which allows 4% interest on judgments against the District while permitting interest at the prevailing rate on all other judgments, violates the equal protection guarantee in the due process clause of the fifth amendment. *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The District replies in its brief that the Council "may well have concluded" the interest rate should be lower on judgments against the District, in order to lessen the burden on taxpayers, but that in any event the "Council was not constitutionally required to state a rationale when it retained the 4% rate for the District but altered the rate for other judgment debtors."[13]

■ Since no fundamental right or suspect class is involved here, our standard of review is the rational basis test. *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 175, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980); *McNeal v. Police and Firefighters' Retirement & Relief Board,* 488 A.2d 931, 935 n. 4 (D.C.1985); *Harrington v. City of Chicago,* 116 Ill. App.3d 137, 139, 452 N.E.2d 26, 28 (1983). "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Fritz,* 449 U.S. at 175, 101 S.Ct. at 459 (quoting *Dandridge v. Williams,* 397 U.S. 471, 485–86, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970)). In *Fritz,* the Supreme Court added that, where there are plausible reasons for the legislative action, the court's inquiry is "at an end," because the Su-

preme Court has never insisted that a legislative body articulate its reasons for enacting a statute. *Id.* 449 U.S. at 179, 101 S.Ct. at 461; *accord, Flemming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960); *Allied Stores of Ohio v. Bowers,* 358 U.S. 522, 529, 79 S.Ct. 437, 442, 3 L.Ed.2d 480 (1959); *Harrington,* 116 Ill. App.3d at 139, 452 N.E.2d at 28.

■ In the present case, the District submits that the legislature may well have set the interest rate at 4% in order to lessen the financial burden on District taxpayers who ultimately pay for the judgments rendered against the District. *See id.* That is a rational basis for the disparity in interest rates, even though one may question whether the Council "struck a proper balance" between the "tax saving" for District residents and the "burden imposed" on a judgment creditor obliged to collect less on the judgment because a District entity caused the injury. *Id.* Accordingly, we must conclude that the challenged statute does not offend the Constitution. *Id.* (Illinois statute providing for interest on judgments at rate of 9% per annum or, if judgment debtor is governmental entity, at rate of 6% per annum has rational basis and thus does not violate equal protection clause); *Holt v. City of Bloomington,* 181 Ind.App. 179, 186–87, 391 N.E.2d 829, 833–34 (1979) (Indiana statute providing that interest on judgments against governmental entity shall not begin to accrue until after 180 days from final decision is rationally based on state's right to limit waiver of sovereign immunity and thus does not violate equal protection clause).

## IX.

The judgments on counts I and III are affirmed. The judgment on count II is

---

**13.** Both sides concede there is no legislative history to explain why the District imposed a lower rate of interest on judgments against itself. Mitchell notes that in 1902, when the United States paid one-half of all judgments against the District, Congress provided that interest on such judgments shall be paid at 4%, the same rate paid on judgments against the United States. In 1982, however, Congress provided that interest on judgments against the

United States should accrue at the rate paid on Treasury bills. Federal Courts Improvement Act, Pub.L. No. 97–164, § 302(b), 96 Stat. 25, 55–56 (1982). In the same year, the Council of the District of Columbia amended D.C.Code § 28–3302(c) to provide that the rate of interest on judgments shall be 70% of the rate of interest set by the Secretary of the Treasury pursuant to 26 U.S.C. § 6621, except when the judgment is against the District.

reversed, and that case is remanded for a new trial. The trial court's denial of Mitchell's motion for interest on the judgment at the prevailing rate, instead of 4%, is affirmed.

*So ordered.*

STEADMAN, Associate Judge, concurring:

Like Judge Belson, I join in all of Judge Ferren's careful and insightful opinion, except for portions of Part III. However, my somewhat different analysis ends me at a concurrence in the result to which Part III leads.

I believe the difficulty in this case arises in part because of the dual purposes that a notice of a potentially dangerous condition by an inmate to prison officials can serve. On the one hand, it may be the event that triggers any duty of care at all to the inmate, such as where the condition arises in the period between reasonable prison inspections. (In this sense, but in this sense only, notice of a dangerous condition by the inmate is "legally irrelevant" when the condition should already have been discovered had the prison officials made a reasonable inspection.) On the other hand, it may alert the prison officials to a condition that they should have known of but in fact did not; in this sense, the notice does not trigger the duty of care—that already existed—but rather may forestall an injury which may otherwise occur because of the prison officials' negligence in failing to discover and correct the danger. In this latter sense, the failure to give notice is relevant not to the existence vel non of a duty on the prison officials but instead to a possible claim of contributory negligence.

We all agree on the proposition that a duty of care arises as to dangerous conditions which a reasonable inspection would uncover and, in addition, as to conditions of which the prison officials have actual notice by reason of inmate reports. For essentially the reasons set forth by Judge Ferren, I also agree that an inmate can normally assume that prison officials are doing their job and that any instruction as to the effect of nonnotice to prison officials by an in-

mate of a known dangerous condition should recognize this fact by stating that, viewed in isolation, a responsibility to report turns on the existence of reason to believe that prison authorities are not in fact aware of a danger they should be aware of. Indeed, any such instruction should also make clear the distinction between the two roles that such a notice may serve, as discussed above.

 On the other hand, I agree with Judge Belson that the failure to give notice to prison officials of a known dangerous condition could have a wider relevance in the context of a contributory negligence claim that Judge Ferren's opinion might indicate. I think both opinions go astray in focusing solely on the question of the giving of notice, and do so because of a too ready dismissal of the relevance of other aspects of the conduct of an inmate faced with a known potentially dangerous condition.

Both opinions, as do I, agree that in a macro sense, a prisoner has "no choice in arranging their environment," and ordinary assumption of risk analysis is inappropriate. But I do not think it follows that in assessing the possibility of contributory negligence, the only conduct of the inmate that is relevant is whether he gave notice. (Judge Ferren's opinion, of course, recognizes that active participation by the plaintiff in the creation or aggravation of the dangerous condition may be grounds for contributory negligence.) Even within the prison environment, a prisoner may be able to avoid a particular dangerous area or, in using it, may be able to limit his use to a reasonably necessary extent. The availability and use of these options may well have a bearing on the reasonableness of his decision to rely solely upon the assumption of prison officials' knowledge in lieu of giving notice himself.

There could be a difference, thus, between a nonreporting inmate leaning over a desk while using it for writing or sitting, and using it as a favorite place to take long naps. Or, to take another perhaps farfetched example to make the point, suppose another inmate has set up a spring gun

trap. It is one thing for one knowing of the trap to pass by that area at a smart pace, quite another to continue to regularly watch TV sitting directly in the potential line of fire. (While I think analogies to prison situations must be viewed with caution, I note that in *Scoggins,* the tenant at the time of the accident was removing furniture located under the dangerous ceiling from which water was leaking, in an effort to protect the furniture from damage.) In short, while the inmate has the right to assume that prison officials know or will come to know of a dangerous condition, the possible effect of any failure to report can only be assessed in the totality of the prisoner's conduct in the light of the known dangerous condition.

The difficulty with Judge Ferren's analysis, as I see it, is that under it, an inmate knowing of a dangerous condition could go about his business exactly as before (until and unless he had reason to believe the prison officials did not in fact know of the dangerous condition although they should have). The difficulty with Judge Belson's analysis is that it leaves too open the contributory negligence issue without sufficient regard to the importance of channeling the jury's analysis as discussed above.

There is no need to say more for purposes of disposing of this appeal. As Judge Ferren indicates, the District presented to the trial court no such refined instructional proposal. I concur with his view that on the record of this trial as actually conducted, the trial court's failure to instruct on contributory negligence does not appear unduly prejudicial, let alone a miscarriage of justice. Hence, I concur in the affirmance of the judgment on Count I.

Statement of BELSON, Associate Judge, concurring and dissenting:

I join in Judge Ferren's opinion except for part III(D). I do not agree with its statement that there is a

> general rule, that a prisoner cannot be found contributorily negligent simply because he or she fails to report a dangerous condition which prison management, through its control of the premises, could

have reasonably been expected to discover through regular shakedown and maintenance procedures.

Judge Ferren's opinion at p. 644. That statement is at odds with the basic concept that a tort plaintiff must exercise reasonable care for his own safety. Because Judge Steadman concurs only in the result of Part III, the resolution of the issue whether such a rule exists in this jurisdiction must await another case.

Judge Ferren's opinion observes that where a jury concludes that prison authorities have not made reasonable inspections, with the result that they fail to discover a condition dangerous to prisoners, the District is chargeable with knowledge of what a reasonable inspection would have revealed. This much is indisputable, and it has an important bearing on whether a jury will find prison authorities negligent. The opinion, however, relying on analogies to property law and common carrier law, goes on to state that even if the plaintiff inmate knew of the dangerous condition, he had no duty to report it to prison officials unless "it [was] clear to [him] ... that the prison authorities in fact [did] not know about it" *Id.* Such an approach would permit prisoners to recover damages for injuries caused in part by their own negligence.

It may be helpful to consider how the proposed rule would operate in a hypothetical situation. If a prisoner should learn that an overhead ventilation cover in his dormitory room is dangerously loose, but does not learn how long it has been in taht condition or whether prison officials had been told of it, it would not be "clear" to him that the prison authorities did not know about the danger over his head. According to the suggested approach, he would be free to go about his business under this sword of Damocles without even advising appropriate prison personnel of the condition, and if the cover should fall and injure him, his action for damages could not be met with a defense of contributory negligence. This is anomalous, for it is incontestable that he would not have taken reasonable care for his own safety, and the trier of fact might conclude that

his failure to do so was a proximate cause of his injury.

▇▇▇ Undeniably, there are situations in which prisoners have no means of avoiding dangerous physical conditions. Thus, the doctrine of assumption of risk is generally unavailable in situations in which prisoners are injured upon confronting risks they were powerless to avoid. In addition, the nature of prison life affects the application of the doctrine of contributory negligence. I agree with Judge Ferren, therefore, that appellee could not have been found contributorily negligent merely by reason of his being present in his room and leaning over a desk under the ventilator. Judge Ferren's opinion at pp. 639–640. I also agree, however, with Judge Steadman that a prisoner's contributory negligence potentially can take many forms and is not limited to failure to give notice of a dangerous condition. Statement of Judge Steadman, concurring, *ante* at 655. As Judge Steadman suggests, lingering beneath such a dangerous condition could amount to contributory negligence, *id.*, or an amalgam of contributory negligence and assumption of risk. See opinion of Judge Ferren, *ante* at 639. But the aspect of Mitchell's conduct to which the District of Columbia draws particular attention is his failure to give notice of the dangerous condition. An inmate's imprisonment normally does not prevent him from giving the authorities notice of a condition that endangers him or his fellow prisoners.[1] And the suggested approach simply blinks reality when it relies on "an assumption" that notice by a prisoner is "redundant" in cases where prison authorities have not actual but mere constructive notice of the danger. By making the legal fiction of constructive notice the determining factor, the approach would assure that future plaintiffs could recover even in instances in which, in fact, they could have avoided injury by giving notice. It seems inappropriate and unnecessary to weave a new fiction-based doctrine limiting the defense of contributory negligence in the area of notice because, I submit, the usual application of that defense in cases like this one produces results that are fair and in keeping with sound public policy.[2]

Invoking the long-recognized defense (without the suggested limitation), prison authorities would be able to make out a *prima facie* case of contributory negligence if they produced evidence (1) that the prisoner knew of the danger, (2) that he failed to report it to prison authorities, and (3) that his failure to report it proximately caused (or concurred in causing) the injury and damages of which he complains.

To prove the element of proximate cause, the prison authorities would have to establish that if the prisoner had given them notice of the condition, it would have made a crucial difference. In other words, it would be the prison authorities' burden to prove by a preponderance of the evidence that the prisoner's failure to warn was a substantial proximate cause of the prisoner's injury. The prisoner could rebut this defense generally by evidence that he had not known of the dangerous condition. He could also offer evidence on the issue of proximate cause tending to show that even if he had known of it and given notice to the prison authorities, his notice would not have led to the remedying of the dangerous condition.

Here, because appellant was entitled to a standard contributory negligence instruction, not the limited instruction suggested in Judge Ferren's opinion, it follows that the trial court erred in denying appellant's request for such an instruction. I cannot agree with my colleagues' conclusion that the failure of the trial court to give that

---

1. I agree with Judge Ferren's view that different considerations may be present where inmates do not report a condition because of fear of reprisals from other inmates. Judge Ferren's opinion at page 644, n. 9.

2. The practice of permitting the jury to consider the defense of contributory negligence has frequently been recognized in cases in which the evidence would support a finding that a prisoner plaintiff failed to seek protection from prison authorities against a particular danger of attacks by other inmates. *See, e.g., Walker v. United States*, 437 F.Supp. 1081, 1083 (D.Or. 1977); *Harris v. State*, 118 N.J.Super. 384, 288 A.2d 36, 40 (App.1972); *Parker v. State*, 261 So.2d 364, 370–71 (La.App.1972).

instruction was not reversible error. The jury was fully instructed on constructive notice, and could have used that theory to conclude that the District was guilty of primary negligence. The jury heard evidence that was ample to sustain the defense of contributory negligence, but did not have the benefit of the District's requested instruction, and did not have the issue of contributory negligence before it. The District of Columbia, therefore, is entitled to a new trial with respect to Count I, appellee's claim for personal injuries resulting from his being struck by a falling ventilator cover.